Donald F. FLANAGAN, Appellee,

v.

GERMANIA, F.A., Appellant.

No. 88–1979.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 15, 1988.

Decided April 5, 1989.

Rehearing and Rehearing En Banc Denied May 12, 1989.

John L. Davidson, St. Louis, Mo., for appellant.

Robert Herman, St. Louis, Mo., for appellee.

Before ARNOLD, Circuit Judge, BRIGHT, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

Germania, F.A., a federal savings association, appeals from an adverse judgment for actual and punitive damages on a tortious interference with contract claim brought by Donald F. Flanagan. Flanagan purchased twenty-eight suntanning beds from Silver Sales, Inc., making a down payment of $29,810. Germania, which had extended credit to Silver Sales' sister corporation, the Plaza Import Sales Company, was alleged to have engaged in loan collection practices that prevented Silver Sales from performing its obligation to deliver the tanning beds. On appeal Germania argues that the district court[1] erred in failing to direct a verdict or enter a judgment notwithstanding the verdict, because Flanagan failed to establish all the elements of a tortious interference claim. Germania also argues that Flanagan failed to prove he was entitled to punitive damages, that the state of Missouri does not recognize a tortious interference with contract claim against lenders attempting to recover commercial loans, and that in any event federal law preempts the right of Missouri to offer such a right of action against a federal savings association. We affirm.

Flanagan ordered the twenty-eight tanning beds from Silver Sales in May of 1985, using a personal check for $29,810 as a down payment. Silver Sales, however, was experiencing severe financial problems.

1. The Honorable William S. Bahn, United States Magistrate for the Eastern District of Missouri.

Flanagan's check was cashed, but no beds were delivered and the money was never returned. Meanwhile Plaza Imports, Silver Sales' sister corporation which owed Germania $550,000, defaulted on its loans. The parties later negotiated a workout agreement that left Germania as the sole stockholder of Silver Sales. Germania appointed new directors and officers to run Silver Sales, all of whom refused Flanagan's demand for delivery of the beds. Flanagan filed suit, obtaining a consent judgment for the amount of the down payment, but the judgment was never collected. Flanagan then brought this action, alleging that Germania had tortiously interfered with the contract between himself and Silver Sales in an effort to collect its own debts.

At trial Germania argued that it had not interfered with the contract, since Silver Sales was financially incapable of meeting its obligations, and that its actions were justified as those of a lender trying to protect its economic position. Germania produced evidence that Plaza Imports' principal asset was a large account receivable from Silver Sales, for tanning beds supplied by Plaza. Additionally, Germania argued that it had a security interest in all tanning beds acquired by Plaza Imports, and that Plaza could not transfer any beds to Silver Sales without written permission, which was never given, and that Silver Sales did receive tanning beds from Plaza while the security agreement was in effect. Relying on this information, Germania's counsel had advised Germania that these circumstances made its behavior proper.

Flanagan, however, produced evidence showing that Germania gave false and fraudulent information to its attorney, and therefore could not have reasonably relied on that attorney's advice. Flanagan showed that John Schlecht, a Germania officer, produced a list of Silver Sales' accounts payable, but did not list either Plaza Imports or Germania as creditors. Schlecht also wrote a memorandum to his superiors boasting that Germania would receive "excess value" and "windfall profits" by collecting Silver Sales' assets. The jury returned a verdict for Flanagan,

awarding $29,810 in actual damages and $50,000 in punitive damages.

On appeal Germania argues that this verdict is not supported by the evidence since Silver Sales was insolvent and could not have performed Flanagan's contract, and because Germania believed its actions were justified on the basis of counsel's advice that Mo.Rev.Stat. § 400.9–502(1) allowed such protections of economic self-interest. Similarly, it claims that the punitive damages award was not supported by the evidence. It further argues that Missouri does not recognize tortious interference actions in these circumstances, but instead limits recovery to statutorily defined remedies. Finally, it claims that federal law preempts this common law remedy against a federal savings association.

### I.

■ We first examine Germania's claim that the state of Missouri does not recognize a tortious interference with contract claim against a lending institution attempting to obtain payment. Flanagan alleged in his complaint that Germania violated Mo. Rev.Stat. § 428.020, a provision allowing remedies when conveyances are made to defraud creditors. This claim was dropped during trial. Germania argues that the Missouri legislature intended for this statute to provide the exclusive remedy in cases such as these, and that the common law tortious interference claim is therefore improper. The district court interpreted Missouri law to allow a tortious interference claim, however, and that determination is entitled to deference. *See G.A. Imports, Inc. v. Subaru Mid–America, Inc.,* 799 F.2d 1200, 1205 (8th Cir.1986); *Pyle v. Dow Chem. Co.,* 728 F.2d 1129, 1130 (8th Cir.1984). Germania can point to no Missouri case law to support its position, and we therefore conclude that the district court's interpretation was not erroneous.

■ Germania's contention that federal law preempts a Missouri tortious interference claim against a federal savings association is likewise without merit. In general, state laws may be preempted in one of

two ways: they can actually conflict with an express or implied federal declaration, or they can be in a field so pervasively controlled that no room is left for state rulemaking. *See Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 152–53, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982); *see also Deford v. Soo Line R.R. Co.,* 867 F.2d 1080, 1083–84 (8th Cir. 1989). Germania relies on regulations promulgated by the Federal Home Loan Bank Board, which has Congressional authority to control the operations of all federal savings associations.[2] These regulations, however, have no direct bearing on the issues before us. *See* 12 C.F.R. Part 545 (1988). Part 545 deals with a number of issues, including what loans can be made by federal associations, but says nothing about the collection practices of those institutions. Nothing suggests that Germania was forced to choose whether to follow federal or state law, a traditional test of whether state and federal laws are in actual conflict. *Cf. de la Cuesta,* 458 U.S. at 153, 102 S.Ct. at 3022.[3]

Additionally, Germania can point to no case law that suggests federal law has completely preempted this banking field. Germania cites *Community Title Co. v. Roosevelt Fed. Sav. & Loan Ass'n,* 670 S.W.2d 895 (Mo.Ct.App.1984), but this case stands only for the proposition that Missouri courts will not issue injunctive relief when state regulatory control of a federal association would result. The question of money damages being awarded against such an institution on a state claim was specifically distinguished. *See Community Title,* 670 S.W.2d at 902–04. Similarly, *de la Cuesta* does not help Germania, since that case dealt with a direct and actual conflict between state law and federal regulations concerning the validity of due on

sale clauses inserted in mortgage agreements. Here, the common law serves only to supplement complementary federal regulation. Moreover, it seems improbable that Congress would have wished all federal associations to be totally free of state control:

> Although they are instruments of the federal government, the associations are privately owned corporations, aiming to make a profit. As such, they "should comply with the business usages and ethics required of others engaged in similar businesses within the state unless such usages and ethics actually conflict or interfere with federal purposes or unless Congress or the federal regulatory body unmistakably indicates otherwise."

*Morse v. Mutual Fed. Sav. & Loan Ass'n,* 536 F.Supp. 1271, 1281 (D.Mass.1982) (quoting *Derenco, Inc. v. Benjamin Franklin Sav. & Loan Ass'n,* 281 Or. 533, 549, 577 P.2d 477, 487 (1978)). Finally, there is some question whether Congress has the power to occupy this entire field even if it wished to. *See de la Cuesta,* 458 U.S. at 171–75, 102 S.Ct. at 3031–33 (O'Connor, J., concurring, and Rehnquist and Stevens, JJ., dissenting). We need not decide this question, since we hold that Congress has not occupied the field, and that Missouri is not preempted from allowing recovery for tortious interference against a federal savings association.

## II.

█ Finally, Germania argues that the jury verdict is not supported by the evidence. The trial court instructed the jury that to find liability it had to find that a contract existed between Flanagan and Silver Sales, that Germania caused Silver Sales to breach that contract, that it did so

---

**2.** Germania especially relies on 12 C.F.R. § 545.2 (1989), which states:

> The regulations in this Part 545 are promulgated pursuant to the plenary and exclusive authority of the Board to regulate all aspects of the operations of Federal associations, as set forth in section 5(a) of the Home Owners' Loan Act of 1933, 12 U.S.C. 1464, as amended. This exercise of the Board's authority is preemptive of any state law purporting to

address the subject of the operations of a Federal association.

**3.** Germania does argue that the original $5,000,-000 request for punitive damages was so large that compliance with an adverse judgment in that amount would have forced it to violate federal net worth regulations. We do not find this argument persuasive. Net worth regulations are designed to protect the investing public, not banks engaged in wrongdoing.

intentionally and without justification, and that Flanagan was thereby damaged. This instruction properly set out the elements of a tortious interference claim in Missouri. *See Franklin v. Harris,* 762 S.W.2d 847, 848 (Mo.Ct.App.1989); *see also Downey v. United Weatherproofing,* 363 Mo. 852, 858–60, 253 S.W.2d 976, 980–81 (1953); Missouri Approved Jury Instruction (MAI) 23.-11 (1981); *cf. American Business Interiors v. Haworth, Inc.,* 798 F.2d 1135, 1143 (8th Cir.1986) (elements of tortious interference with business relationship).

In determining submissibility, we consider the evidence in a light most favorable to the nonmoving party, giving it the benefit of all reasonable inferences. *See Craft v. Metromedia, Inc.,* 766 F.2d 1205, 1218 (8th Cir.1985)); *cf. Loudermill v. Dow Chem. Co.,* 863 F.2d 566, 570 (8th Cir.1988) (standards for a directed verdict). We are aware from the trial transcript that this was a vigorously contested case, but the only issue before us is whether sufficient evidence was presented to support submission of the claims to the jury. The record contains more than enough evidence to allow a reasonable jury to find tortious interference.

■ First, Silver Sales officers testified that they were willing and able to perform the contract, but that they were prevented from doing so when Germania discharged them from their positions. These officers informed Germania that Flanagan's order had not been filled. Schlecht, Germania's officer, testified that he received a list of Silver Sales' accounts receivable that contained a notation stating that Flanagan's beds had not been delivered. Schlecht also admitted that when he inventoried Silver

Sales' assets he discovered approximately $30,000 in actual inventory, which would have been sufficient to allow performance of Flanagan's contract. This evidence could lead a jury to find that Silver Sales would have performed the contract were it not for Germania's interference.

As for Germania's claim of justification, it takes the position that it had the absolute legal right to prefer one creditor over another and to take possession of improperly transferred collateral. The validity of these assertions depends on facts, however, such as whether Germania was actually an indirect creditor of Silver Sales, and whether Silver Sales was in possession of collateral that Germania had a right to repossess. The evidence was in conflict on these questions. The district court submitted an instruction to the jury based on this theory,[4] but the jury rejected it. We are satisfied that there was sufficient evidence to support the jury's finding that Germania tortiously interfered with Flanagan's contract.

■ Furthermore, the record contains sufficient evidence of willful misconduct to support punitive damages. Germania, relying on alleged transactions between Plaza Imports and Silver Sales to justify its conduct, could produce no evidence of intercorporate relations between the two, except for certain records that Germania knew to be false. Germania's representative, Schlecht, admitted that when he talked with Flanagan he concealed the fact that Germania was collecting Silver Sales' accounts receivable. In addition, there was testimony that Germania hired an attorney to defend Silver Sales in Flanagan's first action, instructing him to obtain a consent

---

4. Instruction No. 16 read as follows:

Your verdict must be for Defendant Germania if you believe:

First, Plaza Import was indebted to Germania, and

Second, at the time Plaza Import was indebted to Germania, Plaza Import owned tanning beds or other goods or property which Plaza Import transferred to Silver Solariom Sales Corporation, and

Third, Silver Solariom Sales Corporation then sold or leased such tanning beds or other goods or property, and

Fourth, Silver Solariom Sales Corporation did not pay to Germania all of the proceeds which it received from the sale or lease of such tanning beds or other goods or property, until the debt of Plaza Import to Germania was paid in full.

Proceeds were defined in the instructions as follows:

The word "proceeds" as used in these instructions includes whatever was received when either collateral or proceeds from an earlier sale of collateral are sold, exchanged, collected, or disposed of in any way.

judgment and to avoid revealing that he worked for Germania. Furthermore, Schlecht not only knew that Silver Sales had no direct obligation to Germania, but he conveyed false information to Germania's attorney and bragged to his superiors of the "windfall profits" they could expect to receive. We are satisfied that this evidence is sufficient to allow a jury finding of willful misconduct, and the award of punitive damages was therefore justified.

We affirm the judgment of the district court.