**TUXEDO BEACH CLUB CORPORATION and Edmund C. Wideman, III, Plaintiffs,**

v.

**CITY FEDERAL SAVINGS BANK, in receivership, Resolution Trust Corporation as Receiver, Defendant.**

**CITY SAVINGS BANK, F.S.B., in conservatorship, Resolution Trust Corporation, Conservator, Plaintiffs–Interveners,**

v.

**TUXEDO BEACH CLUB CORPORATION and Edmund C. Wideman, III; Central Glass, Co., Inc., Crossroads Construction Company, Allmilmo Corporation, General Masonry Building and Construction Co., Inc., Alco Incorporated, B & B Custom Drywall Co., Inc., De Falco and Bisconti, Inc., J. Wittman & Sons, Inc. a/k/a Wittman & Sons, Inc., Labor Mechanical Contractors, Hilti, Inc., Defendants.**

**Civ. A. No. 89–5225 (MHC).**

United States District Court, D. New Jersey.

Oct. 31, 1990.

Horn, Kaplan, Goldberg, Gorny & Daniels, P.C. by Mark Soifer, Atlantic City, N.J., for plaintiffs.

Cassidy, Foss & Filippo by Roger J. Foss, and Kathleen A. Sheedy, Red Bank, N.J., for defendant Resolution Trust Corp.

## OPINION

COHEN, Senior District Judge:

This breach of contract and tort action is presently before the Court on plaintiffs' Motion for Partial Summary Judgment and defendant's Motion to Dismiss.

**1.** On September 21, 1990, City Savings Bank, F.S.B. was itself placed into receivership and a third bank, named City Savings, F.S.B. has been created. We use "City Savings" throughout this opinion to refer to both City Savings Bank, F.S.B. and City Savings, F.S.B.

**2.** In a purchase and assumption transaction, the FDIC attempts to prevent liquidation of a faltering bank and the disruptions associated with a bank-closing by arranging for another bank to purchase some of the assets and liabilities of the faltering bank. Three parties are involved in the purchase and assumption transaction: the

## I. FACTUAL HISTORY

### A. The Parties

Plaintiffs, Tuxedo Beach Club Corporation ("Tuxedo Beach"), and its president, Edmund C. Wideman, III ("Wideman") (collectively "Plaintiffs") initiated a lender liability action against defendant, City Federal Savings Bank ("City Federal"), alleging that City Federal fraudulently breached its promise to fully fund the acquisition, construction and completion of a sixty-eight unit residential condominium building located in Brigantine, New Jersey, known as Las Brisas Condominiums (the Project).

Defendant, City Federal, is a financial institution subject to the Financial Institutions Reform, Recovery and Enforcement Act of 1989. P.L. No. 101–73, 1989 *U.S. Code Cong. & Admin.News* (103 Stat.) 183 (FIRREA). Pursuant to this act the Office of Thrift Supervision of the Federal Deposit Insurance Corporation (FDIC) appointed the Resolution Trust Corporation (RTC) to be the receiver for defendant on or about December 7, 1989 after the bank ran into financial difficulties. The RTC as receiver organized City Savings Bank, F.S.B. ("City Savings") to take over certain assets and liabilities of City Federal, pursuant to section 2[11](d)(2)(F)(i) of the Federal Deposit Insurance Act, as incorporated by Section 21A(b)(4) of the Federal Home Loan Bank Act, as amended.[1] Thereafter, RTC, as receiver for City Federal, entered into a purchase and assumption agreement with City Savings whereby City Savings acquired substantially all the assets and assumed certain liabilities of the failed City Federal.[2] On June 6, 1990, the parties

FDIC in its capacity as receiver for the failed bank (FDIC–Receiver), the purchasing bank, and the FDIC in its corporate capacity (FDIC–Corporate). The purchasing bank will purchase only the high-quality assets of the faltering bank. In exchange for these assets, the bank offers to pay a premium to the FDIC–Receiver, representing the going concern value of the faltering bank. Since the low-quality assets are returned to the FDIC–Receiver, assets will usually be substantially less than liabilities. FDIC–Corporate pays the cash difference between the assets and liabilities, less the premium. FDIC–Corporate purchases these low-qual-

consented to allow City Savings, in conservatorship, RTC as conservator, to intervene as the assignee of the mortgage which is the subject of the instant lawsuit, and to file claims against plaintiffs for foreclosure and for sums allegedly due on various notes between plaintiffs and the original defendant, City Federal.

## B. The Dispute

Plaintiffs allege that the defendant, City Federal, had agreed to fund their land acquisition, development, and construction costs of the aforesaid Brigantine, New Jersey project. City Federal provided a loan to fund the first portion of the project and agreed to provide further monies in the future. Plaintiffs maintain that they began construction in reliance upon defendant's promises, and that defendant did not provide further loans, in violation of their agreement. Plaintiffs assert that the half-built project is vulnerable to weather and other elements which can cause it to deteriorate. At the present, plaintiffs claim that there is no funding available to either complete the project or protect it from the elements, and that the project will suffer irreparable harm from unnecessary delay.

Plaintiffs allege that Ron Gigantino, an agent of City Federal, assured Wideman that City Federal would fully fund the Project through its completion. Based upon these assurances, the plaintiffs rejected an offer to sell the land which would have resulted in an immediate $2 million profit. Moreover, City Federal convinced Wideman to accept the initial $11,775,-000.00 loan despite the parties' knowledge that that amount would be insufficient to fully fund the Project. Plaintiffs state that City Federal informed them that reapply-

ing for a larger loan would have involved submitting the new loan's application to its Executive Committee, which employed stricter and more rigid approval procedures than its Officer's Loan Committee, the committee to which the initial loan application had been sent. Therefore, an additional loan would be made, for approximately $2,000,000.00, on the condition that City Federal approve the Project's final plans and that the bank's in-house appraisers value the Project at a sufficient figure to support the additional loan; both conditions were ultimately met.

The initial loan agreement required plaintiffs to produce 25 non-refundable contracts from unit purchasers before City Federal would release more than the first one million dollars. However, when the plaintiffs were unable to meet this requirement, it was waived by City Federal.

In May or June of 1988, Wideman sought the additional loan pursuant to the parties' previous agreement. Plaintiffs maintain that they made several attempts to obtain the loan, but that the only response they received from City Federal was a commitment for one million dollars conditioned on plaintiffs producing 35 non-refundable contracts on the Las Brisas units. Plaintiffs assert that City Federal knew both that the amount was inadequate, and that the condition was impossible.

## II. PROCEDURAL HISTORY

Plaintiffs initially filed their complaint on December 4, 1989 in the Superior Court of New Jersey. A few days thereafter, RTC was appointed receiver and removed the case to this Court on December 15, 1989.[3] The complaint asserts ten counts, charging

---

ity assets from FDIC–Receiver, and minimizes losses by attempting to recover the assets. The entire purchase and assumption transaction is usually completed in one night. *See generally, Gunter v. Hutcheson,* 674 F.2d 862, 865–66 (11th Cir.), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982).

The RTC, with the FDIC as its exclusive manager, now acts as receiver or conservator for institutions for which the FSLIC had previously been appointed. The FSLIC was abolished on February 7, 1989. *See* FIRREA §§ 401, 501, 12

U.S.C. §§ 1437, 1441a(b). In carrying out its obligations, the RTC is authorized to use all the case resolution and financial assistance rights and powers provided to the FDIC. FIRREA § 501(b)(4); *see also,* H.R.Rep. No. 101–54(I), 101st Cong., 1st Sess., *reprinted in* 1989 *U.S.Code Cong. & Admin.News* 86, 357.

3. It is not clear exactly how many days elapsed between the filing of plaintiffs' complaint and the date that the RTC was appointed as receiver for City Federal. The parties' allegations, however, range from 2–5 days.

defendant with breach of fiduciary duty, constructive fraud, breach of duty to act fairly and in good faith, negligent misrepresentation, prima facie tort, tortious interference with prospective economic advantage, intentional misrepresentation, breach of contract, promissory estoppel, breach of covenant to act fairly and in good faith and consumer fraud.

On February 16, 1990, plaintiffs filed a motion for partial summary judgment. The RTC responded to this motion by moving for a 90 day stay of proceedings pursuant to 12 U.S.C. section 1821(d)(12), as amended by FIRREA, which was denied by this Court in an Opinion and Order filed February 9, 1990. *See* 729 F.Supp. 1508 (D.N.J.1990). Thereafter, RTC moved for a 180 day stay pursuant to 12 U.S.C. sections 1821(d)(5), (6), & (7), as amended by FIRREA. This motion was granted in an Opinion and Order filed March 14, 1990. *See* 737 F.Supp. 18 (D.N.J.1990). The 180 day period was applied retroactively, however, from December 7, 1989, which was the date the RTC was appointed receiver for City Federal.

On March 30, 1990, this Court certified its March 14, 1990 Order (granting the 180 day stay) for appeal, however, the Third Circuit denied plaintiffs' request for relief. The 180 day period expired on June 5, 1990. During the interim, on August 23, 1990, the RTC filed an Amended Answer on behalf of City Federal, and an intervener complaint against Tuxedo Beach and its creditors for foreclosure on the mortgage. On June 26, 1990, in response to plaintiffs' pending Motion for Partial Summary Judgment, the RTC filed the instant Motion to Dismiss. Finally, on October 18, 1990, plaintiffs answered the RTC's intervener complaint and filed a counterclaim against the RTC as receiver for City Federal which is similar to plaintiffs' original complaint, but bases the claims on an alleged partnership which was formed between the parties. Presently before the Court is plaintiffs' Motion for Partial Summary Judgment and defendant's Motion to Dismiss.

## III.  DISCUSSION

### A.  Characterization of Defendant's Motion

■ The parties initially dispute whether the defendant's Motion to Dismiss should be treated as a motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim, or rather as a motion for summary judgment pursuant to Fed.R.Civ.P. 56. Plaintiffs maintain that the motion should be treated as one for summary judgment since defendant refers to matters outside the pleadings in its appendix. Rule 12(b) provides that, "[i]f, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the Court, the Motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Defendant replies that the documents included in Defendant's Motion to Dismiss are documents referred to in Plaintiffs' own complaint. That the extraneous documents were originally submitted by plaintiffs rather than defendant is, however, irrelevant to our determination as to how to treat the motion. As stated by Wright and Miller:

> The court has complete discretion to determine whether or not to accept any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion. This discretion generally will be exercised on the basis of a determination of whether or not the proffered material, and the resulting conversion from the Rule 12(b)(6) to the Rule 56 procedure, is likely to facilitate the disposition of the action.

5A C. Wright & A. Miller, *Federal Practice and Procedure*, § 1366, at 491–93 (2d ed. 1990). Thus, we treat defendant's motion as one for summary judgment.

### B.  The Summary Judgment Standard

■ The standard for granting summary judgment pursuant to Federal Rule of Civil

Procedure 56 is a stringent one. Summary judgment is appropriate only if all the probative materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). *See, e.g., Hersh v. Allen Products Co.,* 789 F.2d 230, 232 (3d Cir. 1986); *Lang v. New York Life Ins. Co.,* 721 F.2d 118, 119 (3d Cir.1983). In determining whether there remain any genuine issues of material fact, the court must resolve all reasonable doubt in favor of the nonmoving party. *Meyer v. Riegel Products Corp.,* 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. dismd.,* 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984); *Smith v. Pittsburgh Gage & Supply Co.,* 464 F.2d 870, 874 (3d Cir.1972). Significantly, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

▆▆▆ Under this standard, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. at 2510 (emphasis in original). Indeed, where the moving party has made a properly supported motion for summary judgment, it is incumbent upon the nonmoving party to come forward with specific facts to show that there is a genuine issue of material fact for trial. *Id.* 477 U.S. at 248, 106 S.Ct. at 2510. Thus, once the moving party has carried its burden of establishing the absence of genuine issues of material fact, the nonmoving party "may not rest upon mere allegations or denials" of its pleading, Fed.R.Civ.P. 56(e), but must produce sufficient evidence to reasonably support a jury verdict in its favor. *Id.,* 477 U.S. at 249, 106 S.Ct. at 2510–11; *J.E. Mamiye & Sons, Inc. v. Fidelity Bank,* 813 F.2d 610, 618 (3d Cir.1987) (Becker, J., concurring), and not just "some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Thus, if the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

### C. The Agreement to Fully Fund the Loan

Turning to the merits of the case, we first address the enforceability of City Federal's purported promise to fully fund the Project with supplemental loans.

#### 1. The Parties' Contentions

Plaintiffs contend that defendant's Motion to Dismiss assumes an issue of material fact, namely that no writings exist in City Federal's records which establish the parties' agreement to fully fund the loan. Because no discovery has been produced to date (which could uncover such writings), the Court should deny or continue defendant's motion to dismiss pursuant to Rule 56(f). Moreover, plaintiffs assert that City Federal's files contain numerous documents and evidence of the bank's commitment to fully fund the Project, and that these documents may be integrated to form a fully enforceable contract in satisfaction of section 1823(e). Furthermore, plaintiffs urge that the *D'Oench, Duhme* doctrine and section 1823(e) do not automatically bar every claim based on a verbal contract with an insolvent bank. Significantly, plaintiffs note that it was Congress' expressed intention to continue to honor commitments made by the bank to creditworthy small businesses without interruption or termination. *See* 12 U.S.C. § 1821(n)(3)(B).

Defendant maintains that the alleged oral understandings between plaintiffs and City Federal fail to meet the requirements of section 1823(e) and *D'Oench, Duhme* since these alleged agreements were not in writing, and were not continuously available in the banks records for scrutiny. Defendant further contends that the plaintiffs' entire case is based on unwritten agreements which are unenforceable. Congress gave the FDIC (now the RTC) broad discretion in determining unsafe and un-

sound banking practices, and its ability to prevent the harm from such practices is vital to the integrity of the nation's banking system.

### 2. The "Writing" Requirement Under *D'Oench, Duhme*, Section 1823(e) and *Langley*

In *D'Oench, Duhme & Co. v. Fed. Deposit Insurance Corp.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), the Supreme Court set forth the federal common law doctrine which protects bank insurers from the enforcement of secret agreements. D'Oench, Duhme & Company was a securities dealer and had sold bonds to a bank in the 1920's. After the bonds defaulted, the company agreed to execute unconditional notes payable to the bank so that the bank would not show any past due bonds in its books. The receipt for the bonds stated that "This note is given with the understanding it will not be called for payment." *Id.* at 454, 62 S.Ct. at 678. The FDIC later acquired the note in a purchase and assumption transaction, and attempted to enforce it against the company. The company asserted failure of consideration as a defense, based on the undisclosed agreement that the note would not be called for payment. The Supreme Court held that "this 'secret agreement' could not be a defense to suit by the FDIC because it would tend to deceive the banking authorities.... When the maker 'lent himself to a scheme or arrangement whereby the banking authority ... was likely to be misled,' that scheme or arrangement could not be the basis for a defense against the FDIC." *Langley v. Fed. Deposit Insurance Corp.*, 484 U.S. 86, 92, 108 S.Ct. 396, 402, 98 L.Ed.2d 340 (1987) (quoting *D'Oench, Duhme*, 315 U.S. at 460, 62 S.Ct. at 681).

The Federal Deposit Insurance Act of 1950, § 2[13](e), as amended, 12 U.S.C. § 1823(e) (1989), partially codifies *D'Oench, Duhme*, and provides that:

No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the [FDIC] unless such agreement—

(1) is in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and,

(4) has been, continuously, from the time of its execution, an official record of the depository institution.

*Id.*

In *Langley v. Fed. Deposit Ins. Corp.*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), the Supreme Court considered the scope of the term "agreement" under section 1823(e), and held that the section bars the defense of fraud in the inducement against the FDIC. In *Langley*, the petitioners financed the purchase of land through a loan with an FDIC insured bank. In consideration for the loan, they executed a note, a collateral mortgage, and personal guarantees. After petitioners failed to pay the first installment, the bank sued, and the case was consolidated with a claim the petitioners previously filed with the bank. The petitioners claimed that the land was procured by the bank's misrepresenting that the land was larger than it was, that it contained many more acres of minerals than existed, and that it was not encumbered by leases, which it was. The FDIC was later appointed receiver of the bank, and acquired the note in a purchase and assumption transaction. The FDIC was substituted as plaintiff in the lawsuit and moved for summary judgment on its claim.

The Court rejected petitioner's defenses of fraud in the inducement and misrepresentation. The truth of an express warranty, the Court held, was a condition to payment of the note which was part of the "agreement" to which the writing, approval, and filing requirements of section

1823(e) attach. The Court reasoned that section 1823(e) was intended to allow bank examiners to rely on a bank's records when evaluating the worth of a bank's assets (which is often done during urgent overnight evaluations), and that the FDIC would be unable to make reliable evaluations if bank records contained seemingly unqualified notes subject to undisclosed conditions. *Id.* at 90–92, 108 S.Ct. at 400–02. The Court concluded that only fraud in the factum would be a real defense and render section 1823(e) inapplicable, since that would make the instrument entirely void. Moreover, the Court was unwilling to "engraft an equitable exception upon the plain terms of the statute," and held that the FDIC's knowledge of the misrepresentations prior to its acquiring the note was not relevant to whether section 1823(e) applies. *Id.* at 94, 108 S.Ct. at 402–03.

■ Courts have often applied section 1823(e) and the *D'Oench, Duhme* doctrine coextensively. Section 1823(e) specifically applies to "agreements" between the borrower and the bank, and thus, in applying section 1823(e), the borrower's conduct is irrelevant. The *D'Oench, Duhme* doctrine, however, is a rule of equitable estoppel and applies to any defense that a borrower may assert in which the borrower participated in a scheme which tends to deceive the bank examiners. *See* Note, *Borrower Beware: D'Oench, Duhme and Section 1823 Overprotect the Insurer When Banks Fail,* 62 *S.Cal.L.Rev.* 253, 271 (1988) [hereinafter Note, *Borrower Beware*]. In this respect, the statute is both broader and narrower than *D'Oench, Duhme.* It is broader in that it applies to *any* agreement, whether or not it was secret and regardless of the maker's participation in a scheme; it is narrower in that it applies *only* to agreements, and not to other defenses the borrower might raise. *Id.* at 271–72. In terms of protection afforded to federal insurers, however, the *D'Oench, Duhme* doctrine has been significantly more expansive than section 1823(e). *See Vernon v. Resolution Trust Corp.,* 907 F.2d 1101, 1105 (11th Cir.1990) (comparing cases asserting defenses under both *D'Oench, Duhme* and 1823(e)).

■ In the instant case, to the extent that City Federal's agreement with plaintiffs to fully fund the loan is based on their *oral* understanding, it is clearly an unenforceable side agreement within section 1823(e) and the *D'Oench, Duhme* doctrine. Courts have routinely barred similar agreements. *See, e.g., Beighley v. Fed. Deposit Ins. Corp.,* 868 F.2d 776, 783 (5th Cir.1989) ("'[w]e have consistently held that' 12 U.S.C. § 1823 applies ... to make irrelevant the assertion against the corporate FDIC of any unwritten side agreements such as the agreement to make future loans'") (quoting *Fed. Deposit Ins. Corp. v. Lattimore Land Corp.,* 656 F.2d 139, 142 (5th Cir.1981)); *Mainland Savings Assn. v. Riverfront Assoc., Ltd.,* 872 F.2d 955 (10th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 235, 107 L.Ed.2d 186 (1989) (*D'Oench, Duhme* and section 1823 prevent enforcement of oral side agreement to fund a second loan).

■ However, as stated above, plaintiffs contend that the present motion is premature since they have not had an opportunity to inspect any of defendant's files as discovery has barely begun. Plaintiffs maintain that the initial pretrial discovery which has taken place suggests that the bank's records are replete with evidence of the agreement to fully fund the loan. Plaintiffs hope to "integrate" these documents in order to create a fully enforceable agreement, in satisfaction of section 1823(e). Although we are mindful of the possible futility in allowing plaintiffs to engage in extensive discovery, in light of the stringent requirements of section 1823(e) and *D'Oench, Duhme* and its progeny, summary judgment is not proper as to plaintiffs' breach of contract claims where, as here, the parties dispute factual, not legal issues. *See generally,* C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2725 (2d ed. 1983). At this early stage in the litigation, we are satisfied that plaintiffs have presented a material issue of fact sufficient to defeat defendant's motion and allow the parties to proceed with dis-

covery.[4]

We are compelled to comment on the showing that plaintiffs will be required to make upon completion of discovery, however, since, as defendant has noted during oral argument, if a written "agreement" to fully fund the loan actually exists, its absence from plaintiffs' own records is considerably conspicuous. *Compare, Oliver v. Resolution Trust Corp.*, 747 F.Supp. 1351, 1352 (E.D.Mo.1990) ("had the necessary writing been executed, plaintiffs would obviously be aware of the fact and capable of alleging it specifically"). To enforce the agreement to fully fund the loan, the documents constituting the agreement must satisfy each of the requirements of 1823(e) and *D'Oench, Duhme. Compare, Fed. Deposit Ins. Corp. v. Texarkana Nat'l Bank*, 874 F.2d 264 (5th Cir. 1989), *cert. denied,* — U.S. —, 110 S.Ct. 837, 107 L.Ed.2d 833 (1990) (no setoff against claim by FDIC where writing requirement was not met); *Fed. Deposit Ins. Corp. v. La Rambla Shopping Center, Inc.*, 791 F.2d 215 (1st Cir.1986) (lease executed two years prior to execution of note could not constitute a defense or be subject of counterclaim since contemporaneous execution requirement was not met); *Fed. Deposit Ins. Corp. v. Gardner*, 606 F.Supp. 1484 (S.D.Miss.1985) (agreement to look to third party for collection of note not enforceable where board approval requirement was not met); *Fed. Deposit Ins. Corp. v. Amberson*, 676 F.Supp. 777 (W.D. Tex.1987) (breach of agreement to obtain additional funding by bank no defense to claim by FDIC where requirement that agreement be continuously reflected in bank's records was not met). In view of the important federal policy in ensuring the integrity of the nation's banking system, it is not surprising that courts have strictly adhered to these statutory and common law requirements. *But Cf.* Note, *Borrower Beware, supra*, (arguing that courts

have given overly broad protection to failed banks at borrowers' expense under section 1823 and *D'Oench, Duhme* in light of the language and history of the statute and the actual needs of the FDIC). Indeed, courts have refused to recognize lenders' agreements to provide additional financing based on documentary evidence produced after extensive discovery.

In *Beighley*, for example, the court found that seventy-one documents submitted by the plaintiff, some of which were executed contemporaneously with the note and many of which were part of the bank's official records, did not meet the requirements of section 1823, or at the very least, raise a material fact issue to preclude summary judgment. *Beighley*, 868 F.2d at 782–83 & n. 11.

*Federal Savings & Loan Ins. Corp. v. Two Rivers Assoc., Inc.*, 880 F.2d 1267 (11th Cir.1989) is particularly instructive as that case is almost identical factually, and raises the same issues as the case at bar. Defendant was a corporation organized to develop a condominium complex in Florida. After a series of meetings and correspondences, the defendant received a commitment from a savings and loan (the bank) to finance the project. Although the defendant requested funding for the entire project in the amount of $10 million, agents of the bank represented to defendant that it would be easier to approve several smaller loans than one large loan. The loan officers agreed that the bank would fully fund the project, although this agreement was not memorialized in any of the loan documents. The initial loan included a "profit participation" fee of $4,500.00 per unit. Subsequently, additional loans were rejected since, according to the bank, the defendant's reserve accounts were near depletion. The FSLIC was appointed receiver after the bank faltered, and acquired the

---

**4.** Plaintiffs have submitted the sworn statement of Ronald Gigantino, a former City Federal construction loan officer, which indicates that City Federal had knowledge of the agreement to fully fund the loan. *See* Certification of Ronald Gigantino, Exhibit A of Plaintiffs' Brief in Support of their Motion for Partial Summary Judg-

ment. Thus, it is possible that discovery will uncover documents reflecting the alleged agreement. As discussed below, however, these documents, if they exist, must together satisfy the requirements of section 1823(e) in order to bind the RTC.

notes and mortgages (which thereafter were in default) in a purchase and assumption transaction. *Id.* at 1268–70. The FSLIC filed an action to enforce the notes and mortgages, and defendant asserted defenses and affirmative counterclaims based on the agreement to fully fund the loan. Defendant contended, *inter alia*, that the agreement was not a secret agreement since it was reflected in the various letters and documents.

The court held that, although *D'Oench, Duhme* did not bar the assertion of defenses based on bilateral obligations, none of the agreements gave the FSLIC notice of a binding obligation to fund the entire project. *Id.* at 1275. Although the documents ambiguously referred to an understanding between the parties, there was no explicit acceptance of an obligation to fund the entire project. Accordingly, the court held that the defendant's defenses and counterclaims based on the undisclosed agreement were barred under *D'Oench, Duhme.*

Similarly, in *RSR Properties, Inc. v. Fed. Deposit Ins. Corp.,* 706 F.Supp. 524 (W.D. Tex.1989), the plaintiff attempted to enforce an agreement allegedly made with a bank to renew several loans which were in default. In rejecting plaintiff's claims under 1823 and *D'Oench, Duhme,* the court stated:

> The summary judgment evidence establishes that extensive negotiations were required to raise the memorandum to the level of an agreement. The document does not provide for an interest rate, set provisions for default, specify the dates or duration of the renewals, or detail the specific collateral provisions which were in dispute. On the plain language of the requirements of 1823(e),

there must be an 'agreement.' There is no agreement capable of enforcement under Texas law against any party. Thus, even the threshold test for applicability of 1823(e) is not met. The Court also notes that the putative agreement does not meet the requirement that the asset be acquired contemporaneous with the execution of the document; it sketches out a potential agreement which never became reality.

*Id.* at 532.

Although these cases demonstrate the difficulty plaintiffs will face in satisfying the statutory and common law requirements for enforcement of the agreement to fund the Project, in each of these cases the parties were entitled to pretrial discovery and the courts' consideration of the documentary evidence. Thus, we deny defendant's motion in order to provide plaintiffs an opportunity to locate documents which, under New Jersey law, rise to the level of an enforceable contract, and which satisfies the remaining requirements of section 1823(e) and *D'Oench, Duhme* as set forth above.[5]

### D. Breach of Fiduciary Duty
#### 1. The Parties' Contentions

In a letter dated September 28, 1987, City Federal indicated that, in addition to other origination fees, the loan commitment included "equity kickers"[6] which transformed the parties' relationship from that of lender/borrower to a partnership or joint venture. The Commitment Agreement provided that "an origination fee of $2,500.00 for the first 34 units and $7,500.00 for the second 34 units will be paid [to City Federal] at the time of conveyance of each unit." Letter from City Federal Savings Bank, by William Spagnoli,

---

**5.** Because neither party has briefed the issue, we decline to decide whether plaintiffs' "integration" theory can even survive section 1823(e) under New Jersey contract law. We note in passing, however, that cases such as *Sutton v. Lienau,* 225 N.J.Super. 293, 300 (App.Div.), *cert. denied,* 111 N.J. 650, 546 A.2d 559 (1988), suggest that documentary evidence which satisfies the so-called "merchant's memorandum" rule does not constitute a written contract, but rather evidences an oral contract which satisfies the

policies underlying the statute of frauds. We leave open the issue whether documentary evidence of an oral contract can satisfy the writing requirement of section 1823.

**6.** An "equity kicker" is a provision in which the lender receives a stake in the equity underlying the loan. Plaintiffs use the term here to refer to the provision which provides for the per-unit fees to be paid to City Federal.

Vice President, to Edward C. Wideman, III (Sept. 28, 1987). Plaintiffs contend that City Federal was, in essence, sharing the expected profits which thereby formed a partner or venturer relationship between the bank and plaintiffs. As a partner, City Federal owed plaintiffs a fiduciary duty. By failing to honor the agreement to fully fund the loan, plaintiffs maintain, City Federal breached its fiduciary duty. Unlike the breach of contract claims, this cause of action is founded upon documents which ostensibly satisfy section 1823(e), *i.e.*, the "equity kicker" provision contained in the Commitment Agreement. Moreover, at oral argument, plaintiffs maintained that section 1823 and *D'Oench, Duhme* are inapposite to the claim for breach of fiduciary duty since plaintiffs are not attempting to enforce an *agreement*, but rather are asserting a claim arising out of defendant's tortious *conduct*.

Defendant's principal contention is that this claim is barred by section 1823(e) and *D'Oench, Duhme* since it is based upon the oral side agreement to fully fund the loan. Moreover, defendant maintains that these so-called "equity kickers" are nothing more than origination "fees" which are not dependant on the profits or losses of the plaintiffs; the provision merely made the additional origination fees payable at a later date than the origination fee which was due at closing.

### 2. Section 1823(e) and *D'Oench, Duhme* as a Bar

■ In *Astrup v. Midwest Fed. Savings Bank*, 886 F.2d 1057, 1059–60 (8th Cir. 1989), the Eighth Circuit allowed a developer to assert a claim against a savings and loan in receivership for breach of fiduciary duty. In that case, the developer entered into a joint venture with a wholly-owned subsidiary of the defendant lender. The court distinguished this type of claim from one to enforce an agreement:

> The *D'Oench Duhme* doctrine simply forbids fabrication of fictitious assets for inclusion in the accounts receivable portfolio of regulated financial institutions

tending to mislead and deceive bank examiners in their investigations to determine the financial condition of such institutions. That doctrine affords no protection against tort claims against a financial institution, whether for personal injuries to a motorist in a collision with an armored car bringing money to the S. & L. office, or for insider profits in a sale of securities violating Securities and Exchange regulations, or for fraudulently entering into transactions [with borrowers].

*Id.* at 1059–60.

At least one court, however, has distinguished *Astrup* where the side agreements themselves constituted the breach of fiduciary duty. *Oliver v. Resolution Trust Corp.*, 747 F.Supp. 1351, 1352 (E.D.Mo. 1990). That court barred the fiduciary duty claim in this instance where the plaintiff failed to allege the existence of the side agreements so as to satisfy section 1823(e).[7] *Id.* Other courts have held that the *D'Oench, Duhme* doctrine precludes the assertion of affirmative claims against the FDIC, such as breach of fiduciary duty, which are based on secret side agreements. *See, e.g., Beighley*, 868 F.2d at 782–84 & n. 12.

The distinction between the *Astrup* and *Oliver* cases can be explained by 12 U.S.C. section 1821(d)(9)(A) (FIRREA § 212(a)) which provides that "any agreement which does not meet the requirements set forth in section 1823(e) of this title shall not form the basis of, or substantially comprise, a claim against the receiver or the [RTC]." Where the success of an asserted tort claim hinges on an agreement which does not satisfy the requirements of section 1823(e), it is not necessary to determine whether or not the claim falls within the confines of section 1823(e) or *D'Oench, Duhme;* for the claim must fail under the plain meaning of section 1821(d)(9)(A).

Our conclusion is not inconsistent with the recent opinion by the Eleventh Circuit in *Vernon v. Resolution Trust Corp., su-*

---

**7.** The court also concluded, in the alternative, that the plaintiffs failed to support a finding that a fiduciary relationship existed between the parties.

*pra.* In that case, the court declined to extend section 1823(e) and *D'Oench, Duhme,* to bar shareholder claims against a defunct savings and loan for federal and state securities and RICO laws and common law fraud. The court observed that "[n]aturally, the fraud, misrepresentation and other malfeasance alleged by appellants do not appear within the records of" the defunct bank. *Vernon,* 907 F.2d at 1108 n. 6. The court continued: "Certain claims, such as tort claims, might not appear in the books of a failed bank and yet be easily shown to be valid." *Id.* at 1108. The FSLIC is obligated to " 'settle, compromise, or release [such] claims in favor of or against [the defunct bank], and to do all other things that may be necessary in connection therewith,' and to 'pay all valid credit obligations of [the defunct bank].' " *Id.* (quoting 12 U.S.C. § 1729(b)(1)(B), (d)).

However, the court distinguished that case from almost every other *D'Oench, Duhme* case by noting that the plaintiffs were "not obligees trying to avoid their commitment on an asset which the [assuming bank] acquired in a purchase and assumption agreement." *Id.* at 1107. In most cases, as in the case *sub judice,* "the FDIC, the FSLIC, [the RTC] or some successor in interest asserted or defended the validity and enforceability of a particular debt or monetary obligation owed to the failed bank, be it a promissory note, a mortgage, a letter of credit or personal guaranty or collateral pledge agreement securing a loan...." *Id.* In these cases, as indicated above, section 1821(d)(9)(A) bars all claims which are based on, or substantially comprised of, a "side agreement" which does not satisfy the requirements of section 1823(e).

Plaintiffs' contention that their breach of fiduciary duty claim is based on the partnership allegedly formed as a result of the profit participation provision in the Commitment Agreement, which in turn satisfies the requirements of section 1823(e), is misguided. Assuming that plaintiffs are correct in their assertion that a partnership was created under the Commitment Agreement, this would form the basis of the fiduciary *relationship.* However, City Federal's breach of the agreement to fully fund the loan is what forms the basis for City Federal's claim for breach of this fiduciary relationship. It is apparent, therefore, that the agreement to fully fund the loan forms the basis of, or substantially comprises, plaintiffs' claim against the RTC as receiver for City Federal, and hence this agreement must satisfy section 1823(e).

### 3. Existence of a Fiduciary Relationship

■ Although we are affording plaintiffs an opportunity to furnish documents to the Court, which may ultimately enable them to satisfy the requirements of section 1823(e) with respect to the agreement to fully fund the Project, this claim must nevertheless fail since we find that no fiduciary relationship was created by the Commitment Agreement. Even if we accept plaintiffs' contention that the "equity kickers" resulted in City Federal sharing in the expectant profits with plaintiffs, this alone would not transform the lender/borrower relationship into a partnership or joint venture.[8]

Plaintiffs have the burden of establishing that a partnership exists. *Fenwick v. Unemployment Compensation Comm.,* 133 N.J.L. 295, 44 A.2d 172 (1945). New Jersey has adopted the Uniform Partnership Act which defines a partnership as "an association of two or more persons to carry on as co-owners a business for profit." *N.J.Stat.Ann.* § 42:1–7 (West 1975). In addition to sharing in the profits,[9] elements to

---

**8.** Under New Jersey law, the elements of a joint venture are identical with those required for a partnership. *Kozlowski v. Kozlowski,* 164 N.J. Super. 162, 171 (Ch.Div.1978).

**9.** Section 42:1–7 provides:

42:1–7 Rules for determining existence of partnership

In determining whether a partnership exists, these rules shall apply:

. . . .

4. The receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment:

a. As a debt by installment or otherwise,

be considered include the intention of the parties, obligation to share in losses, ownership and control of partnership property and business, community of power and administration, language used in the partnership agreement, conduct of the parties toward third persons, and rights of the parties upon dissolution. *Fenwick, supra.* Thus, "[w]hile the statute, R.S. 42:1–7, creates a *prima facie* presumption of a partnership where the profits are shared, not every agreement that gives the right to share profits is for all purposes a partnership agreement." *Farris v. Farris Engineering Corp.,* 7 N.J. 487, 502–03, 81 A.2d 731 (1951).

We agree with Judge Friendly's statement that

[p]laintiffs ... face[ ] serious difficulties in establishing the existence of a fiduciary relationship between a lending bank and the security holders of a borrowing corporation. While such a development is not beyond the realm of possibility, it would have required a significant extension of existing procedures. The fiduciary relation recognized ... between a manager of a corporation and its shareholders ... has been accorded such status for nearly a century. In contrast, appellants have cited us to no decisions in which a fiduciary relationship was found to exist between a bank and its borrower's security holders. Moreover, the extension of fiduciary principles to this relationship would face serious obstacles, such as arguments that lending relations between banks and large corporations are the product of arm's-length bargaining and that it would be anomalous to require a lender to act as a fiduciary for interest on the opposite side of the negotiating table.

*Weinberger v. Kendrick,* 698 F.2d 61, 78–79 (2d Cir.1982), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983). While

courts have held that a bank may stand in a fiduciary relation to its lender, *see, Connor v. Great Western Savings and Loan Assoc.,* 69 Cal.2d 850, 73 Cal.Rptr. 369, 447 P.2d 609 (1968), sharing in profits is insufficient, in itself, to create a fiduciary duty. *See In re Pinetree Properties, Ltd.,* 87 B.R. 481 (Bankr.N.D. Ohio 1988); *In re Teltronics Services, Inc.,* 29 B.R. 139, 170–71 (E.D.N.Y.1983), *aff'd,* 762 F.2d 185 (2d Cir.1985) ("[i]n the rare circumstances where a creditor exercise such control over the decision-making process of the debtor as amounts to a domination of its will, he may be held accountable for his actions under a fiduciary standard"); *see generally,* Leiderman, *A Survey of Lender Liability Cases for Commercial Loan Officers, Special Assets Administrators and Their Counsel,* 507 *P.L.I.Comm.* § D[4] (1989). Accordingly, since plaintiffs have not demonstrated that City Federal has exerted the type of control over plaintiffs necessary for the formation of a fiduciary relationship, this claim must fail.

### E.  Constructive Fraud

To the extent plaintiffs' claim for constructive fraud is based on oral misrepresentations, this claim is barred under *Langley.* The complaint reveals that the claim relies on the existence of the agreement to fully fund the loan. Therefore, for the reasons set forth in Section II.D.2. of this Opinion, the claim will not be dismissed until plaintiffs have had an opportunity to conduct discovery. Following this period, the claim may only be asserted if plaintiffs can submit documents to the Court such that the agreement satisfies section 1823(e) and *D'Oench, Duhme,* in accordance with Section II.C.2. of this Opinion.[10]

### F.  Consumer Fraud

■ Defendant maintains that the New

---

d.  As interest on a loan, though the amount of payment vary with the profits of the business,

e.  As the consideration for the sale of ... property by installments or otherwise.

*N.J.Stat.Ann.* § 42:1–7.

**10.** If such documentation is submitted, allowing the fraud claim would not be contrary to *Langley,* for the reasons stated in note 12, *infra.*

Jersey Consumer Fraud Act[11] (CFA) cannot be asserted against the RTC under case law which has limited the scope of that statute, and on federal supremacy grounds. We disagree.

Defendant relies on *Westervelt v. Gateway Financial Service*, 190 N.J.Super. 615, 625 (Ch.Div.1983), which held that the New Jersey legislature did not intend to include second mortgage transactions within the scope of the CFA. However, the court based its reasoning on the fact that secondary mortgage transactions are extensively regulated by New Jersey's Secondary Mortgage Loan Act, *N.J.Stat.Ann.* § 17:11A–34 *et seq.*, and that the two statutes provide for conflicting remedies and different regulatory schemes. *Westervelt*, 190 N.J.Super. at 624–25, 464 A.2d 1203. The court concluded that "there is no sound reason to suppose the legislature meant to subject the same subject matter to two distinct and conflicting regulatory schemes." *Id.* at 625, 464 A.2d 1203. *See*

*also, Daaleman v. Elizabethtown Gas Co.*, 77 N.J. 267, 390 A.2d 566 (1978) (CFA did not apply to public utility because of extensive regulations pertaining to utilities).

Defendant correctly points out that the Savings and Loan industry is intensely regulated by Congress. However, defendant does not point to, nor does our research reveal, any provision in FIRREA or any other federal statute which would conflict with a private right of action under the CFA. A conflict would exist if plaintiffs' claim under the CFA is based on, or is substantially comprised of, an agreement which does not satisfy 12 U.S.C. section 1823(e). Federal law would, of course, bar the claim under the CFA in this instance.[12] However, so long as plaintiffs satisfy the federal statutory and common law requirements following discovery (*i.e.*, sections 1821(d)(9)(A), 1823(e) and the *D'Oench, Duhme* doctrine), there is no reason why they may not maintain a cause of action for City Federal's alleged fraudulent practices.

---

11. *N.J.Stat.Ann.* section 56:8–2 provides, in pertinent part:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

The CFA defines "merchandise" as "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." *Id.* § 56:8–1(c). Corporations are considered "consumers" and can maintain a cause of action arising from the sale of merchandise for business use under the CFA. *Hundred East Credit Corp. v. Eric Schuster Corp.*, 212 N.J.Super. 350, 515 A.2d 246 (App.Div.), *cert. denied*, 107 N.J. 60, 526 A.2d 146 (1986). We are aware of *Werner & Pfleiderer Corp. v. Gary Chemical Corp.*, 697 F.Supp. 808 (D.N.J.1988), where the court held that the CFA does not extend to contractual disputes between experienced commercial entities. To the extent a party seeks duplicative remedies for purely economic loss, we agree with the *Werner & Pfleiderer* court. We decline to extend that court's holding as far as its language might suggest, however, as New Jersey courts have applied the CFA to commercial transactions regardless of the sophistication of the parties. *See Hundred East*, 212 N.J.Su-

per. at 356–57, 515 A.2d 246 ("Business entities, like individual consumers, cover a wide range.... Even the most world-wide business entity can be inexperienced and uninformed in a given consumer transaction. Unlawful practices thus can victimize business entities as well as individual consumers.... [T]o exclude business entities from any protection of the Act would contravene its manifest purpose as well as its unambiguous language."); *see also, Dreier Co., Inc. v. Unitronix Corp.*, 218 N.J.Super. 260, 272–73, 527 A.2d 875 (App.Div.1986).

12. We note that this claim *is* based on, or is substantially comprised of, the agreement to fully fund the loan and must, therefore, satisfy section 1823(e) and *D'Oench, Duhme*. However, if plaintiffs can meet the stringent federal requirements, oral representations independent of the agreement would be admissible to support their claim under the CFA. Such a result would not be inconsistent with *Langley*. As discussed above, in *Langley*, certain representations as to land were made, and the Supreme Court held that these representations were an express warranty that became part of the "agreement." Thus, they could not be asserted as a defense since the representations were not in writing. By contrast, if plaintiffs can produce a written agreement to fully fund the loan, their assertion of a claim on the theory that the agreement itself was fraudulent, would not contravene the policy of 1823(e) and *D'Oench, Duhme* since the RTC would have had notice of City Federal's obligation to plaintiffs.

Although Congress provided for strict requirements which must be satisfied in order to enforce agreements against federally-insured banks, it would in fact be *contrary* to Congressional intent to provide such banks with sweeping immunity from claims arising out of fraudulent practices. Notably, other states have applied their consumer fraud statutes against banks and savings institutions,[13] and federal courts have considered similar state law claims in the face of the federal regulatory scheme.[14]

Thus, like plaintiffs' claim for constructive fraud, the claim under the CFA may proceed provided that plaintiffs can submit documents to the Court such that the agreement to fully fund the loan satisfies section 1823(e) and *D'Oench, Duhme* in accordance with Section II.C.2. of this Opinion.

### G. Liability of the RTC for Punitive Damages

■ Finally, defendant maintains that, to the extent the RTC may ultimately be liable to the plaintiffs, they cannot be liable for punitive damages since, under *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), punitive damages may not be assessed against public instrumentalities. Plaintiffs respond by arguing that the claims are not asserted against the RTC, but rather are asserted against City Federal. Plaintiffs maintain that in the Purchase and Assumption Agreement, City Savings assumed *all liabilities*, which included the claims for puni-

tive damages and consumer fraud. The Agreement states that City Savings purchased all assets of City Federal "subject to all liabilities for indebtedness collateralized by security interests or other liens affecting such assets."

Regardless of whether plaintiffs' claims are asserted against City Federal or the RTC, the RTC, in its capacity as receiver for City Federal, is responsible for managing and resolving the affairs of failed depository institutions. *See* FIRREA § 501(b). It operates for the benefit of creditors, unsecured depositors and the federal taxpayer. Moreover, punitive damages are imposed to punish the wrongdoer and deter others; these considerations have little weight, however, where the wrongful party is in receivership and the fine would ultimately be paid by innocent creditors. *See Security Savings Bank v. Green Tree Acceptance, Inc.*, No. 3–89–90, (D.Minn. Mar. 22, 1990) (1990 WL 36142, *3–4) (citing *Professional Asset Management, Inc. v. Penn. Square Bank*, 566 F.Supp. 134 (W.D.Okl.1983)).

In *Olney Savings & Loan Assoc. v. Trinity Banc Savings Assoc.*, 885 F.2d 266, 274 (5th Cir.1989), the court upheld an award of punitive damages (in the form of a supersedeas bond) levied against a savings and loan which went into conservatorship by the FSLIC. However, in that case, the savings and loan went into conservatorship during appeal, after judgment was rendered. The court thus distinguished

---

**13.** *See, e.g., Le Sage v. Norwest Bank Calhoun–Isles, N.A.*, 409 N.W.2d 536 (Minn.App.1987); *Mid–America Nat'l Bank v. First Savings and Loan Assoc.*, 161 Ill.App.3d 531, 540, 113 Ill.Dec. 367, 373, 515 N.E.2d 176, 182 (1st Dist.1987) ("while we believe that the [Illinois] Consumer Fraud Act may be applied to mortgage lenders," complaint in that case did not state a cause of action); *Morse v. Mutual Fed. Savings and Loan Assoc.*, 536 F.Supp. 1271, 1280 (D.Mass.1982) (Aldrich, J.) (Massachusetts statute proscribing unfair and deceptive trade practices applied to savings and loan); *see also, Madsen v. Western American Mortgage Co.*, 143 Ariz. 614, 694 P.2d 1228 (Ct.App.Ariz. 1st Div.1985) (Arizona Consumer Fraud Act applied to mortgage broker who was licensed to offer federally insured loans).

**14.** In *Flanagan v. Germania, F.A.*, 872 F.2d 231, 234 (8th Cir.1989), the court considered whether federal law preempted a claim against a savings and loan for tortious interference with contract under Missouri law. The court held that federal law has not completely preempted this field, and that "the common law serves only to supplement complementary federal regulation [and that] it seems improbable that Congress would have wished all federal associations to be totally free of state control." *Id. See also, Blair v. Nat'l Construction Co., Inc.*, 611 F.2d 80 (5th Cir.1980) (claim allowed to proceed against bank and other defendant which included claim under Alabama Consumer Fraud Act); *Morse, supra* note 13, at 1280 (Massachusetts statute proscribing unfair and deceptive trade practices not preempted by the Federal Home Owners' Loan Act, 12 U.S.C. § 1464(a)).

*Penn. Square Bank* on the ground that, in that case, "the receiver stepped in before trial and judgment, and punitive damages would have been drawn from assets available for distribution by the receiver." *Id.* However, in *Olney*, the funds for the bond (*i.e.* the punitive damages) were not assets of the bank at the time the FSLIC was appointed conservator, and thus were not under the FSLIC's control. *Id.* The instant case is unlike *Olney* since no judgment has been rendered and any award of punitive damages would be paid out of funds under the RTC's control. Accordingly, we hold that plaintiffs may not assert claims for punitive damages against City Federal or the RTC in receivership for City Federal on the grounds that it would contravene public policy and constitute an assessment of punitive damages against a United States instrumentality.

### III. CONCLUSIONS

1. Plaintiffs' Motion for Partial Summary Judgment shall be DENIED in its entirety;

2. Defendant's Motion to Dismiss the entire complaint shall be DENIED;

3. Defendant's Motion to Dismiss plaintiffs' claims for breach of fiduciary duty shall be GRANTED;

4. Defendant's Motion to Dismiss plaintiffs' claims for punitive damages shall be GRANTED;

5. Defendant's Motion to Dismiss plaintiffs' claims for constructive fraud and consumer fraud shall be DENIED.

As noted above, we have considered defendant's Motion to Dismiss, pursuant to Fed.R.Civ.P. 12(b), as a Motion for Summary Judgment pursuant to Fed.R.Civ.P. 56.

Additionally, plaintiffs shall submit to the Court documentation which establishes a contract, enforceable under New Jersey law, whereby City Federal agreed to fully fund the Project, and which satisfies 12 U.S.C. section 1823(e) and the requirements under federal common law, as set forth above, in order to advance its remaining claims.

An appropriate order shall be filed this day.