**The RESOLUTION TRUST CORPORATION, et al.,**
**Plaintiffs,**

v.

**WELLINGTON DEVELOPMENT GROUP, et al., Defendants.**

**Civ. A. Nos. 90–K–372, 90–K–1601.**

United States District Court,
D. Colorado.

April 4, 1991.

William Baseman, Denver, Colo., for plaintiffs.

Phillip A. Vaglica, Colorado Springs, Colo., for defendants.

## ORDER ON MOTION TO DISMISS

KANE, Senior District Judge.

This is a consolidated action in which the Resolution Trust Corporation (RTC), as Receiver of First Federal Savings and Loan Association of Colorado Springs, seeks to collect a deficiency on the foreclosure of two promissory notes, one made by defendants Wellington Development Group, Richard H. Sucher, William D. Ritchie, Michael S. Kessler and Donald T. Gladstone

(Civil Action No. 90–K–372),[1] and the other by defendants B Street Partners, Richard H. Sucher and William T. Monroe (Civil Action No. 90–K–1601). The Wellington Group has asserted twelve counterclaims based on an implied partnership, fraud, constructive fraud, breach of contract, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, conversion, intentional interference with contract relations and defamation. The RTC now moves for dismissal of certain counterclaims, relying primarily on the doctrine enunciated in *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942) and its statutory counterpart, 12 U.S.C. § 1823(e). For the following reasons, the motion is granted in part and denied in part.

## I. *Facts.*

### A. Wellington Development Group Loan.

On January 25, 1985, the partners of the Wellington Development Group, a Colorado general partnership, executed a promissory note in favor of First Federal in the original principal amount of $3,200,000. The note was secured by a first deed of trust on certain real property located in Colorado Springs, Colorado, commonly known as the Rockrimmon Village Retail Center (the "Rockrimmon property"). The partnership was to use the proceeds from the note to develop a shopping center on the Rockrimmon property (the "Village Center"). The parties also executed a loan agreement, which provided that First Federal was to receive a "contingent interest fee" in the profits generated from the development of the center.

The Wellington Development Group note fell due on January 25, 1988.[2] On February 10, 1988, First Federal declared the note in default and shortly thereafter had a receiver appointed. On October 17, 1989, the Rockrimmon property was foreclosed.

First Federal successfully bid $2,070,000.00 for the property, leaving a deficiency of $1,707,620.89, plus interest. On March 5, 1990, the RTC, as successor to the FSLIC and conservator of First Federal, commenced Civil Action No. 90–K–372 to recover the deficiency from the Wellington Group and its individual partners. On June 29, 1990, the RTC was appointed receiver of First Federal.

### B. B Street Partners Loan.

On February 4, 1987, First Federal extended a loan to B Street Partners, a Colorado general partnership, in the amount of $1,460,000.00. The loan was evidenced by a promissory note and secured by a deed of trust covering certain real property in Colorado Springs, Colorado known as 2025–2055 "B" Street. The terms of the loan were governed by a loan agreement. B Street Partners used the loan proceeds to purchase a retail shopping center on the property.

On July 1, 1989, the partnership failed to make a monthly payment on the B Street loan. First Federal sent the partnership a notice of default on July 25, 1989. When the partnership did not cure the default, First Federal foreclosed on the property, successfully obtaining it at the foreclosure sale on a bid of $961,400.00. On September 10, 1990, the RTC commenced Civil Action No. 90–K–1601 to recover on the $652,437.27 deficiency.

### C. Counterclaims Against First Federal/RTC.

On October 4, 1990, the Wellington Group filed its amended counterclaims in Civil Action No. 90–K–372. The first counterclaim is for a declaratory judgment that a partnership existed between First Federal and the Wellington Group for the construction of the Village Center. The second through sixth counterclaims are for

---

**1.** After this action was commenced, Michael S. Kessler filed for bankruptcy protection and the action was dismissed as to him. Hereinafter, the remaining parties in Civil Action No. 90–K–372 will be referred to collectively as the "Wellington Group."

**2.** In its complaint, the RTC alleges that the note "matured on July 25, 1988." Complaint ¶ 7. The defendants did not deny this in their answer. However, the note and extension agreement, attached as exhibits to several pleadings, indicate that the note matured on January 25, 1988.

fraud, constructive fraud, breach of contract, breach of the covenant of good faith and fair dealing, and breach of fiduciary duty, respectively, growing out of the above-alleged partnership. The seventh counterclaim is for conversion, relating to First Federal's application of a payment on the note. In addition to the above counterclaims, the Wellington Group asserts as its eighth through eleventh counterclaims requests for damages for intentional interference with contractual relations, breach of contract, conversion and defamation arising out of First Federal's loan to B Street Partners. Finally, the twelfth counterclaim is for setoff of any damages awarded on the foregoing claims against the defendants' potential liability to the RTC.

On October 18, 1990, the Wellington Group and the B Street Partners moved to consolidate the two actions. The RTC objected to consolidation. On October 24, 1990, it moved to dismiss the first through seventh and the twelfth amended counterclaims based on *D'Oench, Duhme.* It further argued that the remainder of the counterclaims dealing with the B Street loan were asserted improperly by the Wellington Group. On November 13, 1990, I granted the motion to consolidate.[3] The defendants have responded to the motion to dismiss, attaching as exhibits to their response several of the relevant loan documents. Since the defendants rely on materials beyond the pleadings, I will construe the motion as one for summary judgment. Fed.R.Civ.P. 12(b).

## II. *Merits.*

 The standard for granting a motion for summary judgment under Fed.R. Civ.P. 56 is a strict one. "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to a material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). Consequently, summary judgment will be granted against a party "who

fails to ... establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In determining whether the motion will be granted, the court must construe the evidence and resolve all reasonable doubt in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The RTC's central defense to the Wellington Group's counterclaims is the doctrine of estoppel established in *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and the related limitation codified at 12 U.S.C. § 1823(e). In *D'Oench, Duhme,* a securities broker executed several promissory notes in favor of a bank insured by the FDIC. The broker had previously sold to the bank certain bonds which later defaulted. The execution of the promissory notes was intended to enable the bank to avoid showing on its books any of the defaulted bonds. Receipts for the notes indicated that the parties intended that the notes would not be repaid. Subsequently, certain of the bank's liabilities were assumed by the FDIC, including the notes at issue, and the FDIC sued to recover on them. *See id.* 315 U.S. at 454, 62 S.Ct. at 678.

 To escape liability on the notes, the broker asserted two defenses: the parties' understanding that the notes would not be repaid and the fact that the notes were given without consideration. Affirming the lower court's judgment in favor of the FDIC, the Supreme Court found the above defenses to be unavailing. The Court noted the strong "federal policy to protect [the FDIC], and the public funds which it administers, against misrepresentations as to

---

**3.** Since I have granted the motion to consolidate, I will deem the RTC's objection to the B Street counterclaims on basis that they were asserted improperly by the Wellington Group as either abandoned or moot.

the securities or other assets in the portfolios of the bank which [the FDIC] insures or to which it makes loans." *Id.* at 457, 62 S.Ct. at 679. As the Supreme Court later explained on *Langley v. FDIC,* the FDIC requires this protection because it must undertake an evaluation of a bank's net worth " 'with great speed, usually overnight, in order to preserve the going concern value of the failed bank and to avoid an interruption in banking services.' " 484 U.S. 86, 91, 108 S.Ct. 396, 401, 98 L.Ed.2d 340 (1987) (citing *Gunter v. Hutcheson,* 674 F.2d 862, 865 (11th Cir.), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982)). Thus, regardless of the lack of an overt intent to deceive federal banking authorities, under *D'Oench, Duhme* a defendant may not set up a defense to the collection of a note based on an unrecorded understanding between it and a federally-insured institution.

The test is whether the note was designed to deceive the creditors or the public authority, or would tend to have that effect. It would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority on which respondent relied in insuring the bank was or was likely to be misled.

315 U.S. at 460, 62 S.Ct. at 681.

The federal common-law rule of *D'Oench, Duhme* was supplemented in 1950 with the enactment of the Federal Deposit Insurance Act. That statute, in its current form, provides in relevant part:

No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—

(1) is in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C. § 1823(e). Although the statute refers only to the FDIC, the RTC is deemed to have the same powers and rights as the FDIC to carry out its duties under the Act. *See id.* § 1441a(b)(4).

The parties, as have many courts, refer to § 1823(e) as the codification of the *D'Oench, Duhme* doctrine. *See, e.g., Mainland Sav. Ass'n v. Riverfront Assocs., Ltd.,* 872 F.2d 955, 956 (10th Cir. 1989). Yet, the protection afforded by the doctrine and the statute are distinct. "[T]he statute *expands D'Oench, Duhme* in that it applies to any agreement, whether or not it was "secret," and regardless of the maker's participation in a scheme. At the same time, however, the statute is *narrower* than *D'Oench, Duhme* in that it applies only to agreements, and not to other defenses the borrower might raise." Note, *Borrower Beware: D'Oench, Duhme and Section 1823 Overprotect the Insurer When Banks Fail,* 62 S.Cal.L.Rev. 253, 271–72 (1989); *see also Hall v. FDIC,* 920 F.2d 334, 339 (6th Cir.1990); *Kilpatrick v. Riddle,* 907 F.2d 1523, 1529 n. 2 (5th Cir.1990) (dissenting opinion), *cert. denied,* — U.S. —, 111 S.Ct. 954, 112 L.Ed.2d 1042 (1991); *Tuxedo Beach Club Corp. v. City Federal Savings Bank,* 749 F.Supp. 635, 642 (D.N.J.1990); *FDIC v. MM & S Partners,* 626 F.Supp. 681, 684 n. 2 (N.D.Ill.1985).

■ Here, whether characterized as a "scheme" or an "agreement," the bulk of the Wellington Group's counterclaims to the RTC's collection of the deficiency fail. The Wellington Group's first through sixth counterclaims are all dependant on its allegations that First Federal and it were in a partnership, joint venture or had formed a special or fiduciary relationship for the development of the Village Center. The Wellington Group bases these claims on alleged oral representations made in meetings and telephone conversations by First Federal's agents, officers and employees

that the two parties were acting with a common purpose and that First Federal would take actions only for their joint benefit.[4] These are precisely the type of defenses that *D'Oench, Duhme* and § 1823(e) preclude. *See, e.g., Mainland Sav. Ass'n v. Riverfront Assocs., Ltd.*, 872 F.2d at 956 (setoff defense based on allegations of lender's gross negligence, reckless conduct, breach of contract, breach of implied covenant of contractual fair dealing barred); *Chatham Ventures, Inc. v. Federal Deposit Ins. Corp.*, 651 F.2d 355, 362 (1981) (summary judgment granted on defense of oral joint venture agreement), *cert. denied,* 456 U.S. 972, 102 S.Ct. 2234, 72 L.Ed.2d 845 (1982); *RTC v. Colorado 126 Partnership,* 746 F.Supp. 35, 37 (D.Colo.1990) (§ 1823(e) bars breach of fiduciary duty, breach of covenant of good faith and fair dealing, fraud, constructive fraud, mitigation of damages, waiver, laches and estoppel defenses); *University Drive Professional Complex, Inc. v. FSLIC (In re University Drive Professional Complex, Inc.),* 101 B.R. 790, 795–98 (Bankr.S.D.Fla.1989) (denying defense based on oral joint venture agreement).

The Wellington Group attempts to escape the inevitable by contending, first, that its allegations of a joint venture are not based on any scheme or agreement between the parties, but on First Federal's "conduct" which manifested its intent to form such a relationship. In *FDIC v. MM & S Partners,* 626 F.Supp. at 685–87, the court confronted a nearly identical argument. The defendants in *MM & S Partners* argued that "their waiver and estoppel defenses are outside the collateral agreement they allegedly made with Continental.... They reason that because these two defenses do not depend on mutual assent, but rather focus on Continental's

conduct, the defenses are not agreement based, and, therefore, are not precluded." *Id.* at 685. The court in that case characterized this argument as the defendants' attempt to "dress[ ] their breach of oral agreement defense up in the garb of waiver and estoppel." *Id.* at 687. It went on to reason,

> Under the circumstances of these note enforcement cases, waiver and estoppel theories, although technically based on the banks' conduct, really are arguments that a partially performed agreement should lie outside the reach of § 1823(e). The defendants' answer and counterclaim here are, as is indicated *supra* at 3, filled with references to Continental's "representations," "understandings," and unwritten "agreements" not to enforce the written terms of the Restated Agreement. Their "conduct" based allegations are merely assertions that Continental and defendants performed part of their oral agreement.

*Id.* at 686.

The holding in *MM & S Partners* is in line with the Supreme Court's subsequent ruling in *Langley v. FDIC,* 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987). In *Langley,* the Court held that § 1823(e) barred the petitioners' fraud in the inducement defense to the FDIC's collection action, even though the lender had materially misrepresented the acreage and mineral resources of certain real property. In so ruling, the Court construed expansively the term "agreement" in § 1823(e) to encompass more than an express promise to perform an act in the future, but all conditions on the parties' performance of their bargain. *Id.* at 90–91, 108 S.Ct. at 400–01. Here, the Wellington Group does not identify specifically the conduct of First Federal that underlies its defenses. Neverthe-

---

4. For example, the defendants allege:

 During the negotiations between the Plaintiff and Wellington regarding financing the acquisition and development of Village Center and the adjacent land, James R. Glaskin, the President of First Federal, was involved in direct discussions of financing with Defendant Gladstone.

 During the above referenced discussions, Mr. Glaskin stated and acknowledged that Wellington and First Federal were engaged in

a joint undertaking with regard to the acquisition and development of Village Center and the adjacent land.

 From the inception of the transaction involving the acquisition and development of Village Center and the adjacent land it was understood by the individual Wellington partners ..., Wellington and First Federal that they were engaged in a partnership.

Complaint ¶ 11–13.

less, under any possible reading of the counterclaims, it is clear that the Wellington Group relies on events constituting basic conditions on the parties' performance of their bargain. The counterclaims are precluded under *Langley*, as based on an agreement violating § 1823(e), and under *D'Oench, Duhme*, as a "scheme" likely to mislead federal banking authorities.

█ The Wellington Group's second line of defense is that the loan documents themselves reflect the joint venture between the parties. Specifically, the defendants cite a provision of the loan agreement which provided that First Federal was entitled to a "contingent interest fee" equal to 25 percent of the net proceeds from the sale of the Rockrimmon property.[5] The Wellington Group argues that this provision conclusively establishes that it was in a partnership with First Federal. Since the loan agreement was in writing and on file in the bank's records, the Wellington Group contends that its defenses arising out of the alleged partnership/fiduciary relationship are not barred by *D'Oench, Duhme* or § 1823(e).

The Wellington Group is correct that the *D'Oench, Duhme* doctrine and § 1823(e) do not bar defenses arising out of express terms of the loan documents themselves. *See, e.g., FDIC v. Cover*, 714 F.Supp. 455, 458 (D.Kan.1988). However, the argument that equity payments to a lender under the loan documents create a partnership between lender and borrower was raised and rejected in a similar case. In *Tuxedo Beach Club Corp. v. City Federal Savings Bank*, 749 F.Supp. 635 (D.N.J.1990), the lender was entitled to certain "equity kickers" upon the borrowers' sale of condominium units financed by the proceeds of note. *See id.* at 644 & n. 6. The borrowers contended that this profit-sharing arrangement transformed the usual lender-borrower relationship into a partnership or joint venture and therefore its breach of fiduciary duty claims were not barred. *Id.* at 644–45. The court disagreed. "Even if we accept plaintiffs' contention that the 'equi-

ty kickers' resulted in City Federal sharing in the expectant profits with the plaintiffs, this alone would not transform the lender/borrower relationship into a partnership or joint venture." *Id.* at 646. The court acknowledged that, while some courts have held that a lender may stand in a fiduciary relationship to its borrower, "sharing in profits is insufficient, in itself, to create a fiduciary duty." *Id.* at 647; *see also In re University Drive Professional Complex, Inc.*, 101 B.R. at 798. The borrower must show that the lender exercised an unusual degree of control over the borrower so as to dominate its decision-making process. *Id.*

Although the *Tuxedo Beach* court relied on law from other jurisdictions in its analysis, the application of Colorado law in this case leads to a similar result. In *Dolton v. Capitol Federal Savings & Loan Association*, the Colorado Court of Appeals stated:

> In the absence of special circumstances, the legal relationship between a lending institution and its customer is that of debtor and creditor. While there is no *per se* fiduciary relationship between a borrower and lender, a fiduciary duty may arise from a business or confidential relationship which impels or induces one party "to relax the care and vigilance it would and should have ordinarily exercised in dealing with a stranger." "A confidential relationship arises when one party has justifiably reposed confidence in another." ... [A] fiduciary relationship between a borrower and lender has been found to exist where there is a repose of trust by the customer along with an acceptance or invitation of such trust on the part of the lending institution.

642 P.2d 21, 23–24 (Colo.App.1981) (citations omitted); *see also Rubenstein v. South Denver Nat'l Bank*, 762 P.2d 755, 756 (Colo.App.1988). In this case, absent other evidence, First Federal's entitlement to the contingent interest fee does not lead to the conclusion that the lender so dominated the decision-making of the Welling-

---

5. Alternatively, if the note was paid in full before the property was sold, the loan agreement provided that First Federal was to receive a sum equal to 25 percent of the net equity of the property. Net equity was defined to mean the fair market value of the property, less certain identified expenses.

ton Group as to create a fiduciary relationship. The contingent fee was simply another element of the lender's consideration for making the loan. The Wellington Group points to no other provisions in the loan documents which indicate that First Federal exercised an unusual degree of control over the development of the Village Center. Without relying on oral representations, which are barred under *D'Oench, Duhme* and § 1823(e), it simply cannot establish its partnership defenses. Accordingly, its first through sixth counterclaims fail as a matter of law.

■ The RTC has also moved for dismissal of the Wellington Group's seventh counterclaim for conversion. This counterclaim is based on the Wellington Group's sale of a parcel of the Rockrimmon property to Safeway, Inc. in August, 1985. The Wellington Group alleges that it forwarded the proceeds from that sale, $698,652.20, to First Federal for application as a payment on the Wellington Development Group note. Instead of applying this sum to reduce the outstanding balance of the note, the Wellington Group alleges that First Federal, without notice, treated the funds as profits from the sale of the property and allocated the proceeds to itself under the contingent interest fee provision of the loan agreement.

The RTC argues that, stated as a conversion claim, these allegations fail because the Wellington Group did not show that it had title or a right to the property claimed to be converted, relying on *Glenn Arms Associates v. Century Mortgage & Investment Corp.*, 680 P.2d 1315, 1317 (Colo.App. 1984). In *Glenn Arms*, the plaintiff claimed that the defendant misappropriated funds which it was to have held in escrow. If anything, this case supports the Wellington Group's position, in that its claim is essentially that First Federal misappropriated funds by failing to apply them to reduce the loan balance. Likewise, this counterclaim is not barred by *D'Oench,*

*Duhme* or § 1823(e). Unlike the other counterclaims arising out of the Wellington Development Group loan, this counterclaim can be resolved based on documentation and correspondence on file,[6] without reference to oral agreements or understandings.

Finally, the RTC moves to dismiss the twelfth counterclaim for setoff. Because the Wellington Group's conversion counterclaim and the B Street counterclaims survive this motion, the setoff claim is viable as well.

Accordingly, the RTC's motion to dismiss, treated as a motion for summary judgment, is GRANTED as to the defendant's first through sixth counterclaims, and is DENIED as to the seventh through twelfth counterclaims.

---

**6.** For example, the Paragraph 3 of the deed of trust covering the Wellington Development Group loan states, "[u]nless applicable law provides otherwise, all payments received by Lender under the Note and paragraphs 1 and 2 hereof shall be applied by Lender first in payment of amounts payable to Lender by Borrow-

er under paragraph 2 hereof, then to interest payable on the Note, then to the principal of the Noted, and then to interest and principal on any future advances." This creates at least a factual dispute whether First Federal breached its obligation to apply the payments on the Note properly.