**FEDERAL DEPOSIT INSURANCE COR-PORATION, as Receiver of Citizens State Bank of Fulda, Petitioner, Appellant,**

v.

**Duane K. SATHER, Respondent.**

**No. C9–90–2010.**

Supreme Court of Minnesota.

Aug. 14, 1992.

Brian E. Palmer and Thomas O. Kelly, III, Dorsey & Whitney, Minneapolis, for appellant.

Charles Quaintance, Jr., David F. Herr, Virginia A. Bell, and Richard A. Kempf, Maslon, Edelman, Borman & Brand, Minneapolis, for respondent.

WAHL, Justice.

The primary issue before us in this case is the applicability of the federal common law *D'Oench, Duhme* doctrine which protects the Federal Deposit Insurance Corporation when it takes over the assets of failed banks by barring the defenses of borrowers who have "lent [themselves] to a scheme" which resulted in the misstatement of the banks' assets.[1] Also at issue is the applicability of 12 U.S.C. § 1823(e).

Appellant Federal Deposit Insurance Corporation ("FDIC"), as receiver of Citizens State Bank of Fulda ("Bank"), sued respondent Duane Sather to recover under a promissory note in the principal sum of $350,000.[2] The FDIC did not sue on the face value of the $350,000 note, but relied on bank records detailing transactions to determine the amount owing. The trial court applied the *D'Oench, Duhme* doctrine to bar Sather from raising at trial the defenses of fraud and lack of consideration, based on the trial court's finding that Sather had executed a secret agreement with the bank and, thus, "lent himself to a scheme likely to mislead banking authorities." After a court trial, Sather was found liable for $305,500, plus interest, costs and disbursements totaling $525,537.

The court of appeals reversed the trial court as to the application of the *D'Oench, Duhme* doctrine and ordered judgment entered in favor of Sather. The court of appeals held that there was no side or secret agreement but a transaction understood by Sather, the Bank and the FDIC as a line of credit and that the FDIC did not rely on the facial validity of the loan documents. *FDIC v. Sather,* 468 N.W.2d 347, 348 (Minn.Ct.App.1991). The court of appeals did not consider whether 12 U.S.C. § 1823(e) (Supp. II 1990) applies to this case. The FDIC now seeks review. Because we have determined that neither the federal common law *D'Oench, Duhme* doctrine nor 12 U.S.C. § 1823(e) (Supp. II 1990) apply to bar the defenses in this case, we affirm the decision of the court of appeals reversing the judgment below.

On January 7, 1983, Sather, working with Robert E. Howe, executive vice-president to the Bank, executed a note ("Master Note") for $350,000 for the stated purpose of farm financing. The note was due on demand and required semi-annual interest payments. The books and records of the Bank treat the note as establishing a line of credit and demonstrate that Sather did not receive $350,000 on January 7, 1983. Rather, he received various advances shown on the Bank's line transcript statement, pursuant to the line of credit, and each time signed a note to cover the specific amount of the advance received. These advances were consolidated in June 1985 into two renewal notes, each for $62,828.49, the subject of the partial summary judgment.

After the loan consolidation, Sather received an audit confirmation in the mail, dated September 21, 1984, requesting that he confirm a debt of $431,156.98. He threw the first confirmation away. Later, upon receipt of a second confirmation, Sather called the Bank's vice-president, Robert Howe, for an explanation saying, "I don't owe all this," and "I thought we were, you know, at $126,000." Howe explained the dollar amount listed as a combination of the loan balance and the total line of credit and told him to go ahead and sign it. Sather accepted this explanation and did as he was advised, signing and re-

1. *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 460, 62 S.Ct. 676, 680–81, 86 L.Ed. 956 (1942).

2. In addition to the $350,000 note, the FDIC sued on two other notes executed by Sather in the amount of $62,828.49 each. Summary judgment has been entered on these notes and that judgment has been satisfied.

turning the audit confirmation to the accounting firm which was conducting the audit. There is no evidence that this audit confirmation was ever made part of the Bank's books and records or that an audit was ever completed by the accounting firm.

In February 1985, the Commissioner of Commerce of the State of Minnesota closed the Bank and tendered receivership to the FDIC. During this process, the Commissioner discovered that "fictitious loans" had been made. Proceeds from these fictitious loans were ultimately traced to the personal accounts of the executive vice-president of the Bank, Robert E. Howe.[3] Sather's file at the Bank contained "dummy notes" executed by Howe against Sather's Master Note in the amounts of $150,000, $90,000, $35,000 and $30,500. Sather was not aware of the existence or the presence of the disputed notes in his file until after the Bank closed.

After the Bank was closed, the FDIC sent Sather several audit confirmation requests which, unlike the September 21, 1984 request from the accounting firm, identified specific transactions, asking him to confirm the amount of indebtedness. Sather's attorney advised the FDIC that several of the items specified on the audit requests were not Sather's obligations.[4] The FDIC, however, demanded payment on the Master Note, relying on the unsigned "dummy" notes found in the Bank's files to determine the amount owing. The trial court ruled in favor of the FDIC; the court of appeals reversed. We granted review.

■ The question is whether the federal common law *D'Oench, Duhme* doctrine applies in the case before us to bar the defenses of the borrower Sather. While this is an issue of first impression for this court, many federal courts have addressed the issue and have produced a substantial, conflicting and sometimes confusing body of case law in which the arguments of both parties and the decisions of both courts have found support.

We recognize that Congress created the FDIC "to protect the fiscal stability of financial institutions, thereby ensuring the availability of funds deposited within those institutions." *FDIC v. McCullough*, 911

---

**3.** On July 22, 1985, the FDIC, as receiver of the Bank, submitted a proof of loss to Hartford Accident & Indemnity Company of Connecticut, insurer on a Primary Banker's Blanket Bond and Excess Bank Employee Dishonesty Blanket Bond for Citizens State Bank of Fulda. Direct losses totaling $1,823,290 were claimed as a result of a series of dishonest and fraudulent acts committed by the Bank's vice-president, Robert Howe. The FDIC also submitted a "contingent claim" in the amount of $480,500. The FDIC received a settlement of $975,000 on the bonds on January 7, 1987. The amount received included money covering the losses arising from the Sather transactions that are at issue here. However, that payment was not allocated by the terms of the settlement to any of the particular claims.

**4.** The items listed on the audit confirmation requests were identified by the FDIC during its examination of the books and records of the Bank. These disputed obligations include:

1) $150,000 advanced under an unsigned note dated December 20, 1982. (This note predates the Master Note at issue here.) The $150,000 was disbursed to Bank Vice–President Robert Howe. Sather never received any funds from this note. (The line transaction statement shows that this note was paid on December 20, 1982, leaving a zero balance owing on the note.)

2) $35,000 advanced under an unsigned note dated February 17, 1983. Robert Howe received $27,500 from this note. Sather acknowledged receiving $7,500 of this money. The $7,500 was consolidated with other loans and included in the amount that was the subject of the partial summary judgment. (The back of this note reflects that it has been paid and that the balance due and owing is zero.)

3) $90,000 advanced under an unsigned note dated June 30, 1983. The proceeds of this note were transferred to a Citizens State Credit Company account by Robert Howe. Robert Howe owns all of the stock of Citizens State Credit Company. Sather never received any funds from this note. (The back of this note reflects that it has been paid and that the balance due and owing is zero.)

4) $30,500 advanced under an unsigned note dated May 27, 1983. Sather acknowledges that he received this money. However, he consolidated all of his loans, including this one, one month later. This note was paid off and the amount was included in the two notes that were the subject of the partial summary judgment and that have since been paid. (The back of this note reflects that it has been paid and that the balance due and owing is zero. The line transcript statement also reflects that this note has been paid.)

F.2d 593, 594 (11th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991). When an insured bank fails, the FDIC steps in to protect the depositors, generally acting as both the receiver and corporate insurer. *FDIC v. R–C Marketing & Leasing, Inc.,* 714 F.Supp. 1535, 1539 (D.Minn.1989). In order to minimize losses, protect depositors, and maintain depositors' ready access to funds, the FDIC must be able to quickly evaluate the value of the failed bank's assets. For this evaluation the FDIC relies on the books and records of the failed bank. If those records misrepresent the character or value of the assets, the FDIC will be unable to accurately value these assets and may suffer unanticipated losses. *Id.* The doctrine of *D'Oench, Duhme,* "a modification of the doctrine of equitable estoppel," developed to "protect[ ] the FDIC [and the public funds it administers] from secret agreements between borrowers and banks which tend to misrepresent the value of a bank's assets." Marsha Hymanson, Note, *Borrower Beware: D'Oench, Duhme and Section 1823 Overprotect the Insurer when the Banks Fail,* 62 S.Cal.L.Rev. 253, 255 (1988).

In *D'Oench, Duhme & Co.,* petitioner, a brokerage house, executed a renewal note for $5,000 payable to Belleville Bank to allow the bank to carry certain bonds petitioner had sold to the bank which had defaulted without having the past due bonds show up on the bank's records. It was agreed that the note would not be enforced. *D'Oench, Duhme & Co.,* 315 U.S. at 454, 62 S.Ct. at 678. The note was given to the bank in 1933. The FDIC insured the bank in 1934. The note was charged off by the bank in 1935. *Id.* In 1938, the FDIC acquired the note as part of the collateral securing a loan for the assumption of Belleville's deposit liability by another bank, and was misled into believing the note was a genuine asset because the agreement that

the note would not be enforced was a secret agreement. *See id.* at 460, 62 S.Ct. at 680–81. No bank records revealed otherwise. Indeed, the bank records revealed interest payments made with the intention of making the note appear alive and misleading the authorities as to its validity. *Id.* at 456, 62 S.Ct. at 679. Petitioner was responsible for the creation of the false status of the note in the hands of the bank, *id.* at 461, 62 S.Ct. at 681, and, through its actions, gave continuing permission to the bank to carry the note as a real asset. *Id.* at 459–60, 62 S.Ct. at 680–81. The court barred the petitioner from asserting as a defense the secret agreement not to enforce the note.

The *D'Oench, Duhme* doctrine provides that, when a note is "designed to deceive the creditors or the public authority, or would tend to have that effect" and the borrower "lent himself to a scheme or arrangement whereby the [FDIC] was or was likely to be misled," the borrower may not assert a defense to enforcement of the note that arises out of an unwritten agreement. *D'Oench, Duhme & Co.,* 315 U.S. at 460–61, 62 S.Ct. at 680–81. "Simply put, transactions not reflected on the bank's books do not appear on the judicial radar screen either." *Bowen v. FDIC,* 915 F.2d 1013, 1016 (5th Cir.1990). Thus, "[a]s between private parties and federal deposit insurance agencies, * * * the Supreme Court [has] placed the burden on private parties to document fully the contours of their obligations from the inception of the transaction." *Baumann v. Savers Fed. Sav. & Loan Ass'n,* 934 F.2d 1506, 1517 (11th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1936, 118 L.Ed.2d 543 (1992).[5]

The FDIC contends that the *D'Oench, Duhme* doctrine applies here. The FDIC argues that the Master Note signed by Sather must be viewed in isolation, without reference to the books and records of the

---

**5.** The use of the doctrine to shift the risk of loss associated with unwritten agreements from the FDIC to the individual borrower has been severely criticized: "[I]ts only certain effect is to redistribute the cost of bank failure from taxpayers, each of whom bears only a small fraction of the total cost, to a small number of note makers whose individual liability may be significant." *FDIC v. Leach,* 772 F.2d 1262, 1270 (6th Cir.1985) (Merritt, J., dissenting). *See also* Robert W. Norcross, Jr., *The Bank Insolvency Game: FDIC Superpowers, the D'Oench Doctrine, and Federal Common Law,* 103 Banking L.J. 316, 344–47 (1986).

Bank. Because the face of the Master Note does not clearly reveal an agreement to extend a line of credit, the FDIC argues, the agreement to extend a line of credit is an unwritten side agreement that could deceive bank examiners. In addition, the FDIC asserts that the borrower, Sather, by returning the audit confirmation for a debt of $431,156.98 has acquiesced in the mischaracterization of an asset on the books of a failed bank and, therefore, has in fact lent himself to a scheme by which the FDIC was likely to be misled. The FDIC insists that Sather is estopped from asserting a defense challenging the mischaracterization of the asset in an action brought by the FDIC to collect on the asset.

The FDIC supports its position with authority suggesting that, under the *D'Oench, Duhme* doctrine, the FDIC is to be treated as a holder in due course.[6] In a situation such as this, where the FDIC has knowledge of the questionable status of the Master Note and where the FDIC acquired the Master Note in a bulk transfer, the FDIC would not qualify for holder in due course status under Minnesota state law. *See* Minn.Stat. § 336.3–302 (1990). However, some courts have interpreted the *D'Oench, Duhme* doctrine to provide to the FDIC the same level of protection under federal common law as states provide to holders in due course under state law, if the FDIC does not meet the requirements of state law.[7] *FDIC v. McCullough*, 911 F.2d 593, 603 n. 10 (11th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991) ("If the FDIC could satisfy state law holder in due course requirements, there would be no reason to invoke federal common law * * *."); *Firstsouth, F.A. v. Aqua Const., Inc.*, 858 F.2d 441, 443 (8th Cir.1988) ("[F]ederal common law is evolving toward the view that * * *

[the] receiver enjoys the status of a holder in due course regardless of the manner in which it acquires notes.").

■ Under the holder in due course analogy, additional information concerning the status of the Master Note found in the bank records would be irrelevant. It could not form the basis of a defense. However, we agree with the interpretation of the federal common law given by the Arkansas Federal District Court: "To call the [FDIC] a sort of holder in due course is merely a shorthand way of saying that defenses based on facts *not reflected in the association's records* are cut off." *FSLIC v. Smith*, 755 F.Supp. 1432, 1437 (E.D.Ark. 1989) (emphasis added). The federal common law holder-in-due-course doctrine will not prevent the petitioner from raising defenses where, as here, the defenses are based in facts reflected in the Bank's records.

Bank records are not unwritten side agreements nor have they been treated as such by the FDIC in this case. The FDIC is asking this Court to bar defenses based on records that it is relying on to enforce the Master Note. The doctrine "cannot bar a defense based on the same agreement that the FDIC seeks to enforce." *First Texas Sav. Ass'n v. Comprop Inv. Properties Ltd.*, 752 F.Supp. 1568, 1574 (M.D.Fla. 1990) (citations omitted).

The requirement of *D'Oench, Duhme*, as articulated by the Eleventh Circuit, that an agreement be "in writing or otherwise made explicit such that the * * * FDIC would have knowledge of the bank's obligations during an evaluation of the bank's records"[8] has been met in this case. Sather's proffered defenses arise, not out of an unwritten agreement between the Bank and Sather but out of a line-of-credit agree-

---

6. There is however authority that the two doctrines are distinct. *See FDIC v. Byrne*, 736 F.Supp. 727, 731 & n. 6 (N.D.Tex.1990) and cases cited therein.

7. There has been no indication that the United States Supreme Court would accept this interpretation: "[E]ven though the application of the federal holder in due course [doctrine] would have been dispositive of the issue [in *Langley v.*

*FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987) ], the doctrine is not mentioned at all [by the Supreme Court in *Langley* ]." *In re Woodstone Ltd. Partnership*, 133 B.R. 678, 690 (Bankr. E.D.N.Y.1991).

8. *FSLIC v. Gordy*, 928 F.2d 1558, 1567, (11th Cir.1991) (quoting *FDIC v. McCullough*, 911 F.2d 593, 600 (11th Cir.1990)).

ment made explicit in the books and records of the Bank.

This is not a case like *D'Oench, Duhme* where the borrower cooperated with a bank officer in an attempt to mislead bank examiners by signing one thing while agreeing to another. The line-of-credit agreement is not a secret or unwritten agreement but an agreement clearly evidenced in the Bank's line transcript statement, obvious to any bank examiner. In fact, the FDIC's own bank liquidation specialist, Dale Bradley, on examining the Bank's books and records, understood and acknowledged the note to be a master note establishing a line of credit. There was nothing out of the ordinary about this line of credit, such as the Bank routinely offered to its customers, that would create a higher than usual risk that the embezzlement would occur or the bank examiners would be misled. Where a review of the Bank's books and records shows that the Master Note secures a line of credit, the Master Note is enforceable as such.

Sather's predicament is similar to that of Francis Kasal in *FDIC v. Kasal*, 913 F.2d 487 (8th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 1072, 112 L.Ed.2d 1178 (1991). Sather, like Kasal, has been defrauded by a bank official and is asking to be allowed "to prove the true balance of his debt owed." Kasal made payments directly to a bank official with instructions to make payments on his several loans. The bank official failed to deposit the payment or credit them according to Kasal's instructions in breach of an unwritten side agreement. Because the payments were not recorded in bank records, the court barred payment as a defense to the FDIC's action against Kasal on the notes. *Id.* at 492.

*Kasal*, however, is distinguishable. The bank official defrauding Sather left a paper trail in the Bank's records. Because the records reflect the true nature of the transaction, there is a basis in law to avoid the use of the doctrine of *D'Oench, Duhme* and to allow Sather to prove up his debt.

■ The court of appeals, in holding the *D'Oench, Duhme* doctrine inapplicable, based its decision in part on the lack of reliance by the FDIC on the facial validity of loan documents. *FDIC v. Sather*, 468 N.W.2d 347 (Minn.Ct.App.1991). As the FDIC points out, reliance by the FDIC on the facial validity of documents is not required. All that is necessary to invoke the doctrine of *D'Oench, Duhme* is for an obligor, in signing the notes, to have "lent himself to a scheme or arrangement" tending to deceive bank regulators. *D'Oench, Duhme & Co.*, 315 U.S. at 460, 62 S.Ct. at 681.

The FDIC relies heavily on the allegation that Sather "lent himself" to a scheme. The FDIC points to the inaccurate audit confirmation signed by Sather before the Bank was closed. The trial court found that, by returning the audit confirmation, Sather in fact lent himself to a scheme which tended to mislead the bank examiners. The FDIC's position seems to be that the inaccurate audit confirmation, even though never made a part of the Bank's books and records, "taints" all of Sather's other transactions with the Bank, in effect "proving," in retrospect, that the Master Note was indeed "designed to deceive the creditors or the public authority, or would tend to have that effect." *D'Oench, Duhme & Co.*, 315 U.S. at 460–61, 62 S.Ct. at 681.

■ Proof that Sather *in fact* lent himself to a scheme, however, is no more necessary for invoking the doctrine of *D'Oench, Duhme* than is proof of the FDIC's reliance on the facial validity of the document. *FDIC v. Investors Assoc. X., Ltd.*, 775 F.2d 152, 154 (6th Cir.1985) ("maker's intent is irrelevant"). The *D'Oench, Duhme* doctrine is not invoked because of wrongdoing on the part of the borrower. *See Fleet Bank of Maine v. Wilson*, 780 F.Supp. 841, 844 (D.Me.1991) ("The only element of fault necessary to the invocation of the doctrine is the borrower's failure to reduce the agreement to writing."). The fundamental purpose of the doctrine is to ensure that the FDIC can accurately assess the condition of a bank based on the bank's books and records. There is no evidence that the audit confir-

mation was ever made a part of the bank's books and records.

The ability of the FDIC to assess and rely on the Bank's books and records does not require that it be allowed to disregard those books and records in favor of extrinsic evidence if that extrinsic evidence better suits its purposes. We do not agree that evidence outside the bank's records may be used, as the FDIC urges, to transform "an ordinary and good-faith commercial transaction" (here, the establishment of a line of credit with a Master Note) into the kind of secret agreement that would allow the FDIC to invoke the doctrine of *D'Oench, Duhme*.[9] In this case, the FDIC's ability to assess and rely on the Bank's books and records is not affected by an inaccurate audit confirmation never made part of the books and records of the bank. The Master Note, together with other bank records, plainly secures a line of credit and, as such, is enforceable. The FDIC must look to those bank records to determine the amount owing. Because money withdrawn pursuant to unsigned notes found in Sather's file has been identified as that embezzled by a Bank officer, that money should not be included when calculating the amount owing.[10]

Sather's defenses—fraud, lack of consideration, and that the debt is the result of embezzlement by a bank officer—do not arise out of an unwritten side agreement. No unwritten side agreement has been shown to exist. Where, as here, the defenses asserted in an action on a note by the FDIC arise out of an agreement establishing a line of credit manifested in the books and records of the bank, the federal

common law doctrine of *D'Oench, Duhme* does not apply to bar those defenses.

■ Because we hold that the federal common law *D'Oench, Duhme* doctrine does not apply to the facts of this case, we must address whether 12 U.S.C. § 1823(e), data as amended by the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), applies retroactively to pending litigation brought by the FDIC in its capacity as receiver. The emerging trend in the federal courts is that section 1823(e) as amended does apply retroactively. *See Reding v. FDIC*, 942 F.2d 1254, 1259 (8th Cir.1991); *FDIC v. Kasal*, 913 F.2d 487, 493 (8th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 1072, 112 L.Ed.2d 1178 (1991); *FDIC v. Sullivan*, 744 F.Supp. 239, 241 (D.Colo.1990).

Prior to its amendment in 1989, section 1823(e) applied only when the FDIC acquired the assets of a failed bank in its corporate capacity. The 1989 amendment extended the application of section 1823(e) to litigation brought by the FDIC in its capacity as receiver of failed banks. *Carico v. First Nat'l Bank of Bogota*, 734 F.Supp. 768, 769–70 (E.D.Tex.1990). In this case, the FDIC was appointed as receiver of the Citizens State Bank of Fulda in 1985 and commenced this lawsuit in 1987, prior to the passage of the amendment.

"Generally a court must apply the law in effect at the time it renders its decision unless to do so would be unjust or contrary to statutory or legislative direction." *Kasal*, 913 F.2d at 493. Because Sather had no legitimate expectation that the FDIC would liquidate the Bank's assets through

---

**9.** Courts have refused to apply the *D'Oench, Duhme* doctrine when the borrower is "wholly innocent," "not negligent," and had "no knowledge whatsoever" of the misleading scheme. *See FDIC v. Meo*, 505 F.2d 790, 792 (9th Cir. 1974). Evidence outside of the bank's records that a borrower lent himself to an arrangement likely to mislead banking authorities may be relevant to show that the borrower does not qualify for the "wholly innocent" defense. *See, e.g., FDIC v. McClanahan*, 795 F.2d 512, 516 (5th Cir.1986) (signing and delivering blank promissory note to person defendant knew had been convicted of bank fraud "can only be character-

ized as reckless"). Sather has not proffered the defense that he is "wholly innocent."

**10.** We reject that line of cases that puts on the borrower full responsibility for ensuring that a bank is honestly and nonnegligently transacting its business. *See, e.g., FDIC v. Byrne*, 736 F.Supp. 727, 732 (N.D.Tex.1990) ("These decisions suggest that a borrower or guarantor must take into account that a thrift or bank will, negligently or fraudulently, fail to show the true extent of a person's liability and must therefore take steps to ensure that the bank records are accurate.").

receivership rather than by acquiring the assets of the bank in its corporate capacity, retroactive application of the amendment would not affect any substantive rights. We hold that section 1823(e) applies retroactively to the FDIC in its capacity as a receiver of the failed bank.

Finally, we address whether 12 U.S.C. § 1824(e), data as amended, bars Sather's defenses. Although section 1823(e) is viewed by many as a legislative endorsement of case law,[11] the protection afforded is somewhat different:

> [T]he statute *expands D'Oench, Duhme* in that it applies to any agreement, whether or not it was "secret," and regardless of the maker's participation in a scheme. At the same time, however, the statute is *narrower* than *D'Oench, Duhme* in that it applies only to agreements, and not to other defenses the borrower might raise.

Hymanson, *Borrower Beware, supra,* at 271–72.

Section 1823(e) provides that:

> No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it * * * shall be valid against the [FDIC] unless such agreement—
>
> (1) is in writing,
>
> (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
>
> (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C. § 1823(e) (Supp. II 1990).

■ The existence of an agreement is the basis of the defense. The statute applies to any agreement, unwritten or not, regardless of the maker's participation in a scheme. However, the statute bars only those defenses based on agreements that do not meet the statutory requirements. It does not bar defenses that do not depend on the enforcement of a collateral agreement. *See Commerce Fed. Sav. Bank v. FDIC,* 872 F.2d 1240, 1244 (6th Cir.1989); *Riverside Park Realty Co. v. FDIC,* 465 F.Supp. 305, 313 (M.D.Tenn.1978).

A defense alleging embezzlement independently perpetrated by a bank officer without the knowledge of the borrower is not a defense that depends on the validity of a collateral agreement. *See FDIC v. Leach,* 772 F.2d 1262, 1267 (6th Cir.1985). Nor is the line-of-credit agreement at issue here a collateral agreement implicating section 1823(e).[12] The FDIC has failed to establish the existence of any collateral agreement that would implicate section 1823(e).

We hold that neither the federal common law *D'Oench, Duhme* doctrine nor 12 U.S.C. § 1823(e) apply to bar the defenses in this case.

The judgment of the court of appeals is affirmed.

---

**11.** Section 1823(e) of Title 12 is referred to by many courts as "the codification of the *D'Oench, Duhme* doctrine." *See Resolution Trust Corp. v. Wellington Dev. Group,* 761 F.Supp. 731, 735 (D.Colo.1991). This section is often construed in conjunction with the federal common law of *D'Oench, Duhme. Empire State Bank v. Citizens State Bank,* 932 F.2d 1250, 1253 n. 6 (8th Cir. 1991).

**12.** We will not consider the agreement as a whole for the purpose of collecting a debt while invalidating under section 1823(e) the same material when it forms the basis of a defense. *See FDIC v. Panelfab Puerto Rico, Inc.,* 739 F.2d 26, 30 (1st Cir.1984). The FDIC sued, not on the face value of the Master Note ($350,000), but on the amount recorded in the books and records of the Bank, the same books and records that clearly indicate that the Master Note established a line of credit.